NOTICE
Decision filed 03/17/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230261-U

NOS. 5-23-0261, 5-23-0262 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* ESTATE OF PATRICIA A. KINZEL, Deceased | ) | Appeal from the |
| | ) | Circuit Court of |
| (Kenneth Kinzel, | ) | Washington County. |
| | ) | |
| Claimant-Appellant, | ) | |
| | ) | |
| v. | ) | Nos. 20-P-5, 19-P-18 |
| | ) | |
| Kelly Hokeness, Executor, | ) | Honorable |
| | ) | Daniel J. Emge, |
| Respondent-Appellee). | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in denying the appellant's claim to certain business personal property where its finding that he failed to prove the transfer of the disputed property by a preponderance of the evidence was not against the manifest weight of the evidence; furthermore, the trial court did not deny the testator's testamentary capacity where it acknowledged and honored all the terms stated in her written will; and, the trial court did not err in admitting the appellant's August 21, 2019, letter to the executor where the trial court's finding that the appellant failed to make a substantial showing that the letter was a settlement offer was not an abuse of discretion.

¶ 2    The appellant, Kenneth Kinzel, appeals from the order of the circuit court of Washington County denying his estate claims to certain business personal property held by the estate of Patricia Kinzel, deceased. He argues that the trial court's finding that he failed to prove the transfer of the property by a preponderance of the evidence was against the manifest weight of the evidence; that

1

the court erroneously denied the testator's testamentary capacity; and that the court abused its discretion in admitting and considering the appellant's August 21, 2019, letter to the executor of Patricia's estate where the appellant made a substantial showing that the letter was a settlement offer. For the reasons that follow, we affirm.

¶ 3                          I. BACKGROUND

¶ 4      The appellant, Kenneth Kinzel (Ken), and the respondent executor, Kelly Hokeness (Kelly), are siblings, and are both the children of Ronald (Ron) and Patricia Kinzel (Pat). Ron owned a sole proprietorship called Kinzel Fabrication, and Ken worked at his father's business. On February 8, 2019, after a short fight with cancer, Ron passed away. A copy of Ron's will was admitted to probate on February 7, 2020, as a lost will. In his will, Ron left all his property to his wife, Pat. Pat passed away only a few months later, on June 14, 2019. Pat's will was admitted to probate on July 29, 2019. In her will, Pat named Kelly as executor and left all of her property to four of her five children, *per stirpes*. The children named were: Ken, Kelly, Karen Donohue (Karen), and Kathie Roush (Kathie). One child, Keith Kinzel (Keith), was explicitly excluded from both parents' wills.

¶ 5      This dispute arises from an estate claim that Ken makes against Pat's estate. Ken claims that the business personal property from Ron's business, Kinzel Fabrication, was transferred to him at some point before Ron's death, and as a result, does not belong to Pat's estate, but to him. Kelly disputes this claim, maintaining that this transfer did not occur, and that the business personal property from Ron's business is part of Pat's estate. Several hearings leading up to October 7, 2022, were held on various motions and petitions. These hearings and motions made clear that the relationship between Ken and Kelly is extraordinarily contentious. Relevant details from one of those hearings are summarized below.

2

¶ 6     On February 28, 2020, the trial court held a hearing on Ken's petition to terminate independent administration of Pat's estate and Kelly's motion to allow sales. The following relevant facts were adduced at this hearing. While alive, Ron ran Kinzel Fabrication out of a shop located on the property where his and his wife's house was also located. Ken worked as an independent contractor for many years for Kinzel Fabrication. It is undisputed that, after Ron's death, Kinzel Fabrication ceased to exist. However, the parties do dispute whether the equipment associated with the business inventory was transferred to Ken prior to Ron's death.

¶ 7     Brad Small, an attorney, had met with Pat to execute her will and other documents shortly before she died. Small wrote an affidavit alleging that Pat had planned to transfer the shop real estate property to Ken but died before this was completed. After Pat's death, Kelly was appointed independent executor per Pat's will. At some point, Kelly locked Ken out of the shop. The circumstances surrounding this event are disputed. After being locked out of the shop, Ken sent Kelly a letter claiming two items as his own and offering to purchase the other items from Pat's estate. Ken alleges that the letter is an inadmissible settlement letter that was sent in a panic after he was locked out of the shop he had been working out of, had lost access to equipment necessary to complete his work, and was at risk of suffering severe financial damages. Kelly alleges that this letter is not a settlement letter but an admission by Ken that the property associated with Ron's business is rightfully part of Pat's estate. After hearing both attorneys' arguments, the trial court terminated independent administration of Pat's estate and denied Kelly's motion to allow sales. The court also ordered that all cases involving Pat's and Ron's estates be consolidated.

¶ 8     On October 7, 2022, the trial court held a hearing on Ken's claims against his parents' estates. The parties stipulated that certain items had been removed from contention and would be made available to Ken. Kelly's attorney clarified that this stipulation was not that those items were

3

rightfully Ken's property, but that, although they were "still part of the estate," Kelly would no longer "fight over" them. Ken's attorney then called Kelly to the stand and presented her with a copy of handwritten notes by Ron. Kelly confirmed that the notes were Ron's and were in Ron's handwriting. In his notes, Ron had written the names of all four of his children who he and Pat intended to include in their wills: Kelly, Karen, Kathie, and Ken. Under Kelly's name, the words "clown picture" had been written. Kelly understood this notation to mean that, upon their death, her parents wished for her to have a large picture that hung in their living room. Kelly did not have possession of the picture; nor did she include it in the estate inventory, because its value had been less than $100, and it had been sold to the estate buyers.

¶ 9 Under Karen's name, the words "Grandma Hogan's bedroom set" had been written. Kelly understood this to mean that, upon their death, her parents wished Karen to have the bedroom set that had belonged to their grandmother. This bedroom set was still in storage. Under Kathie's name, the words "D.R. set" had been written. Kelly confirmed that this referred to a dining room set and that Kathie had purchased this set from the estate. Under Ken's name, the words "punch bowl, oak B.R. set, all shop tools and E.Q. antique wall stuff" had been written. Kelly understood these notations to indicate instructions by her parents that, "when they passed *** these items were to go to these people." When asked how she knew this to be the case, Kelly referred to a meeting she, Kathie, and Ken had had with Ron and Pat at their house shortly before Ron was admitted for the final time to the hospital. Karen had been unable to make it to the meeting because there had been an ice storm that day. This meeting would have happened around January 2019, since Ron passed away on February 8, 2019.

¶ 10 Kelly had some of the "tangible personal property of [her] father's business or shop property appraised," and the appraisal was given to Ken through her attorney. Kelly explained that

4

the "shop" property had been partitioned off from the "house" property and that the house along with its real estate had been sold. Kelly referred to the remaining five acres as the "shop" property. Ken's attorney presented Kelly with a copy of the appraisal. Save for a few items, Kelly agreed that most of the items that had been on the shop property and appraised had been part of Ron's business. Kelly believed that, at the time of Ron's death, he had only used two Ford F-350s in his business. However, she did not have them appraised as part of the business property. One was included in the estate inventory and was still in the estate's possession, while the other had been sold via the power of attorney prior to Ron's death. She did not recall whether the title to the remaining F-350 had been solely in Ron's name or in both Ron's and Pat's names.

¶ 11 Kelly confirmed that during the last 5 to 10 years of her parents' lives, they had gifted her and her siblings various items, written checks to them from their accounts, given money to them on special occasions, and had even helped one of their daughters purchase a house. She confirmed that, upon her parents' deaths, she had received various nonprobate assets and retirement accounts, among other things. She believed Karen had also received the same. There was also a life insurance policy that had been made payable to her, Karen, Kathie, and Ken. Kelly explained that their fifth sibling, Keith, had been excluded from the estate plan due to his estrangement from Ron and Pat for some time.

¶ 12 Kelly's attorney presented her with the title for the 2002 Ford F-350 that remained in the estate's possession. The title listed Pat and Ron as the truck's owners. Kelly was not aware of any transfer of title to anyone else. Kelly's attorney presented her with the titles for a 2017 Hawk flatbed trailer, a 2000 homemade flatbed trailer, a 1999 Stagecoach box trailer, and an F-250 pickup truck; all items that were among Ken's claims against the estate. The titles all listed Ron as the sole owner of the vehicles, and again, Kelly testified that she was not aware of any transfers

5

of the titles. Kelly confirmed that the titles themselves also did not indicate that any transfers occurred.

¶ 13 Kelly's attorney asked her again about the copy of Ron's handwritten notes. Kelly explained that, as Ron "knew he didn't have a lot of time left," he had been planning to meet with an estate attorney soon and called a meeting at his house to tell his children how he was planning to separate things in his new will. Kelly explained that "as part of that discussion[,] he had left notes for [her] as executor of items that he had promised to his children over the years for after [Pat] and [Ron] passed." Kelly agreed that Ron had wanted Ken to have the items listed under Ken's name in his notes. The dispute grew out of Ken's belief that those items were "his now off the top," whereas Kelly's understanding was that "as [they] divide[d] the estate and [gave] things out[,] these were the items [Ron] wished to go to certain people." Kelly recalled that, at the meeting, she had asked Ron why he did not just write the items into his will directly. Ron declined to do so, believing that his children would "work that out" themselves.

¶ 14 Kelly explained that she always intended to provide the items under Ken's name to Ken but that it would be as "part of his one quarter share in the estate." Ken took issue with this, believing that he was entitled to these items "off the top," in addition to a quarter share in the estate. Kelly then recalled a conversation she had with Ken around one month after Pat had died. Kelly had asked Ken whether he would still like his portion of the estate to include the shop assets, and Ken had responded that, "he didn't want it if it did not include the house." Ken had then made an offer on the house, and Kelly had declined, saying it "was too low." Kelly confirmed that at no point during this conversation did Ken inform her that the shop equipment was already his.

¶ 15 Kelly's attorney then presented her with a copy of a letter Ken's prior counsel had written to Kelly's attorney on August 21, 2019. Kelly confirmed that this was about one month after her

6

conversation with Ken. At this point, Ken's attorney objected to the letter, arguing that it was part of settlement negotiations. Kelly's attorney denied that the letter was part of settlement negotiations, instead characterizing it as "a demand for certain items." Ken's attorney pointed out that the letter referred to resolving "this dispute amicably and without resort to legal action." Ken's attorney stated that, although the letter did "not have in bold letters 'for settlement purposes only,' *** this [was] absolutely a settlement attempt *** in an effort to avoid the current litigation that [was] ongoing right now." Kelly's attorney reiterated that the letter was not part of settlement negotiations but solely "a demand for [Kelly] to provide two items of equipment that were at the shop." Kelly's attorney conceded that "there [were] future communications that could be appropriately identified as settlement demands" but insisted that this letter was not one of them. Kelly's attorney explained that Ken's offer "to purchase several of the items of equipment at the shop from the estate" could not be a settlement offer since it was "not tied to anything," let alone to "not proceed with litigation." The trial court agreed that the specific paragraphs that Kelly's attorney wanted to question Kelly about were not settlement negotiations and allowed the testimony.

¶ 16    Kelly read this sentence from the letter aloud for the trial court: "Please take notice that the following items located in the shop belong to Ken and do not belong to Patricia's estate." She noted that the two items listed were a Hyd-Mech S-20A steel saw and two large welding tables. Kelly testified that the saw was provided to Ken, but she did not believe the welding tables had been. Kelly then read this paragraph of the letter aloud for the court: "In addition, Ken would like to offer to purchase several of the items of equipment located at the shop from the Estate. I believe it may be helpful to both Ken and the Estate if Ms. Hokeness would create an inventory of the items in the shop and permit Ken to make an offer for items on the list." Kelly confirmed that she

7

understood this letter from Ken's prior counsel to be a request to make an offer for the shop items. Nowhere in the letter did Ken's attorney claim that any of the items, apart from the Hyd-Mech steel saw and the two welding tables, already belonged to him.

¶ 17    Bradley Small testified that he had been an attorney for 42 years and that he did estate planning in his work. He confirmed that he had no direct monetary interest in this case. Small testified that he first met with Pat around three to five years prior. He recalled that Ken had contacted him and told him that Pat wanted to discuss estate planning. Small confirmed that he did not know Ken, Pat, or the Kinzel family prior to his meeting with Pat. Small drafted documents for Pat, including her will, based on instructions she had given him during his meeting with her. Small was aware that Pat's late husband, Ron, had operated a fabrication business during his lifetime. Small did not know whether the business was included in the will he drafted for Pat, but he did recall that Pat had spoken to him about her desire to separate the business real estate from a larger tract of land.

¶ 18    Ken's attorney presented Small with a copy of his handwritten notes from his March 13, 2019, meeting with Pat. Small explained that it had "always been [his] practice" to "exclude everybody but [his] client" from the meeting to "make certain that nobody [was] being influenced in any manner." Ken had driven Pat to the meeting and introduced Pat to Small. Although Pat "indicated [that] it was okay for Ken to be allowed in the office with her," Small met with Pat alone and left Ken in the lobby. Ken's attorney then presented Small with a copy of his affidavit. Small recalled drafting the affidavit and confirmed that the details contained in it were correct. Small then read a sentence from his affidavit aloud for the trial court: "Because Mrs. Kinzel confirmed that Ron had already transferred the business and its assets consisting of personal property to Ken, I did not include any provision in the will to transfer the business or its assets to

8

Ken." Small confirmed that the sentence was true. Ken's attorney then presented Small with a "business interest supplement" document that he had filled out during or shortly after his meeting with Pat. Small testified that, if Pat had told him that she had any sort of business interest, he would have listed it in this document. However, as she did not, nothing was listed in the document. Ken's attorney presented Small with a copy of the will that Small had drafted for Pat. The will designated Kelly as executor, and Karen as alternate executor. Small testified that he had drafted these designations in the will because Pat had instructed him to do so.

¶ 19    Small confirmed that he never met Ron because Ron had died before Small's first interaction with the Kinzel family. He did not, therefore, have any direct knowledge of Ron's wishes. Small testified that, although he and Pat had discussed separating off the shop property, this transaction had not been completed prior to Pat's death. Small confirmed that his affidavit was dated November 11, 2019, but denied knowing that his firm had been representing Ken at that time. Kelly's attorney asked Small to explain how a sole proprietorship like Ron's business would be transferred upon the owner's death. Small testified that Pat had told him that "Ken had worked with his dad over the years, that he had been underpaid, that in effect he was buying into the business, sweat equity, *** and that she was directing [Small] to gift all of that over to Ken, because it was his property and she didn't want it shown as any part of her estate." Small characterized this alleged arrangement as a "verbal contract between Ken and his father." However, Small also confirmed that he did not "know anything about Ron's estate plan." Small characterized Ken's involvement during the meeting as "very, very little at all." Small confirmed that, under the will he prepared for Pat, "everything [was] divided amongst the four children in equal shares per stirpes," and there were no other provisions dictating what to do with Pat's

9

property. Small commented that "under law, the executor has the duty \*\*\* to determine what that division is."

¶ 20   Gary Borrenpohl testified that he had no financial interest in the case and that he had been subpoenaed to testify. Borrenpohl testified that he knew Ron during his lifetime, through associations in the neighborhood and taking some work to his business back in the 1980s. Borrenpohl recalled a conversation he had with Ron shortly before Ron passed away. Ron had been showing Borrenpohl around his property when he commented that he had Stage 4 cancer. Ron told Borrenpohl that he was not capable of working as he could "hardly manage" his disease anymore. Borrenpohl pointed out that Ron's business was still up and running, and Ron clarified that his "son [was] doing that." Ron expressed his belief that the shop was "in good hands" and that he was leaving the business to his son. Borrenpohl was unsure of the exact time of this conversation but recalled that it was warm and that "leaves were on the trees yet." Borrenpohl did not contradict Kelly's attorney's assertion that the conversation must have taken place during the summer of 2018. Borrenpohl recounted that, although Ron did not tell him how he had transferred the business, he had told him that "the building and the business was Ken's." Borrenpohl confirmed that by "building," Ron referred to the real shop property.

¶ 21   Gregory Toensing testified that he was an insurance agent, he had no financial interest in the case, and he had been subpoenaed to testify. Toensing knew Ken because his insurance agency insured Ken. Toensing was aware that Ken owned a fabrication business. One of Toensing's employees, Randy Koeller, had worked on the policy for Ron and Ken. Toensing confirmed that Koeller had since passed away. Toensing was familiar with the policy that Koeller had been working on for Ron and Ken, as this was reflected in the business records Toensing routinely maintained, and "due to the fact that [Koeller] was new into the business, [Toensing] reviewed

10

most of his applications and correspondence to make sure they were correct." Ken's attorney handed Toensing a copy of the application for a commercial insurance policy for the fabrication business. Toensing testified that the policy had been requested on July 18, 2018, and that Koeller had completed the application. Prior to that date, his company had never insured any business or commercial operations for Ron.

¶ 22    Toensing denied any direct knowledge of any transfer of the fabrication business but testified that, after Koeller died, Ken told Toensing "several times that the business was supposed to be going over to him and that his father was retiring." Toensing believed that these conversations with Ken occurred around 2018. Toensing believed the insurance policy had ultimately been issued and came into effect around August 1, 2018. He testified that two pieces of equipment were covered—a skid loader and a Bobcat; and that the covered location was 1459 Cattle Pen Road, Okawville. Toensing again denied ever discussing the transfer of the business with Ron and testified that he was unaware of any discussions Koeller might have had with Ron about the transfer. Toensing reiterated that his only knowledge of the transfer came from his discussions with Ken, wherein Ken told him "that Ron was retiring and Ken was going to be taking over the business." Toensing clarified that the issued policy did not cover the sheds or the building, although such coverage had been requested. Kelly's attorney presented Toensing with a copy of the signed check in payment for the insurance premium. Toensing confirmed that the check had been signed by Ron and dated October 19, 2018. Toensing also again confirmed that he never discussed the transfer of the business with Ron.

¶ 23    Ken testified that he currently resided in Okawville and that he had resided there for nine and a half years. Before that, he had resided in Missouri for approximately 20 years. In Missouri, Ken ran his own businesses, performing welding, fabrication, landscaping, and mowing. His

11

parents bought the residence they had lived in at the time of their death in 2008, and he had helped them move. Ken had done "everything from finishing work in the shop to be able to do the move to actual packing, loading, moving, [and] putting up a new shop." Although the house was already existing, the shop property real estate "was a briar patch" that "had nothing, so [they] had to put in driveways, infrastructure, electric, and everything" else. Ken also "didn't have a lot of storage room" at this time, so he moved some of his personal items to the new shop location.

¶ 24    In 2013, after around six or seven years of working for Ron while commuting from Missouri, Ken moved back to Illinois because "it just made more sense to move closer," and his parents "were getting older and were needing some help." Ken also had an employment arrangement with Ron, wherein Ken would work for Ron for a lower salary, fix his own house up, sell it, buy his parents' home, and then take over running Ron's business. Ken was paid weekly as a subcontractor for Ron's business. According to Ken, "comparable jobs to ones that [he] would have had *** besides working for [Ron] would have been paid anywhere from 40 to 60 percent more" than what Ron paid him. Ken alleged that he took a lower rate of pay because he "liked working with [his] dad and it was kind of a buy-in to work at a lower rate to get [his] shop when [Ron] decided he would retire." Ken reiterated that there was an understanding between himself and Ron "that when [Ron] retired, [Ken] would take over," and the business would become his. Ron did not have any employees within the last 15 years. Ken testified that he took lower pay for "all of those years" in order "to help [Ron's] future and [his own]." Ken's home in Illinois was "about three miles by road" from his parents' residence and the shop. Ken was unable to move all his personal belongings from the shop property into his Illinois home because he was still working on his new home. He decided to leave his items at his parents' property while he worked on his

12

new home. Ken testified that he could not live in his new home until "probably four or five months" afterwards, and that, during those months, he slept in a camper in his backyard.

¶ 25    Ken described his relationship with his parents as "amazing," noting that they were "very" close. He "was at their property almost every day and at their house probably at least once a day besides being at the shop." His children also spent time with their grandparents at least "four or five days a week." His children kept some of their personal items at their grandparents' home. Ken testified that he often brought his personal items to his parents' home because they either needed help with things or wanted to see the items. Other times, he inadvertently left his items behind. Ken testified that, in the later years of his parents' lives, he regularly transported them to "shopping, [the] doctor's office, ball games," and "to get together with extended family." At the time of his parents' deaths, some of his personal items were still on their real estate. He had not yet moved those items off their real estate because his "personal items were less important than [his] mom and dad's health, so [he] was quite busy keeping the shop running and taking care of [his] parents." Ken "didn't even think about getting that stuff."

¶ 26    Ken testified that, during the last year of Ron's life, Ron "tried to work" but could only do so for very short periods because working "wore him out." Ken acknowledged that his "sister Kathie took [Ron] to most of his chemo and *** most of the cancer related appointments." Pat had "always had health issues" and did not "drive for probably two or three years prior" to her death, so Ken routinely took her to and from the doctor, grocery stores, and the bank. Ken also took Pat to her estate planning appointment with Small because Pat asked him to do so.

¶ 27    Ken testified that his parents were "generous people during their lifetime" and often gave him and his sisters "money or gifts." Ken explained that, out of the nonprobate property that his parents had left them, Ken was "supposed to get the shop," although, he commented "that was

13

already taken care of." Ken believed his sisters had received "IRAs, and different accounts at the bank." He also noted that there was a life insurance policy that was paid out between him and his sisters. Ken estimated that he had received around $20,000 from the life insurance payout. Ken confirmed that he did not receive any funds from his parents' retirement or savings accounts. He believed the savings account had been a payable on death account that had gone to one of his sisters.

¶ 28    Ken testified that he kept the tools from his side businesses on his father's shop property. Ken alleged that Ron transferred the business and its assets to him sometime in 2018 but could not give an exact date. He explained that "[e]arly 2018 before dad was diagnosed we discussed it, that we were going to the lawyer. He got sick and it got put on the back burner, but there were multiple times through the year as we got insurance and other things in place that it was discussed."

¶ 29    Ken recalled the meeting he and his sisters (excluding Karen) had with his parents before Ron was admitted to the hospital for the final time. Ken testified that, by this time, Ron's business and its assets had already been transferred to Ken. Ken did not "remember exactly" what the meeting was for but recalled that "the gist of it was just how things were going to be handled" in his parents' wills. At the beginning of the meeting, because Ron was feeling unwell that day, Ron asked Ken "to catch the girls up to speed." When Ken attempted to do so, he "got jumped pretty good for taking over the meeting." Ken testified that, at this point, he "backed out of it and dad took over and talked and did whatever." When asked whether it was discussed that the business had already been transferred to him, Ken referred to Ron's handwritten notes taken during the meeting, asserting that the notes "said that that was mine." Ken's understanding of Ron's notes was that the items under each person's name were "undisputed items" that were already "possessions of those people." Ken agreed that, under his theory of the notes' meaning, the clown

14

picture, for example, was Kelly's, and had already been Kelly's "prior to [their] parents' passing." Ken added that, to his knowledge, Kelly's clown picture had never been listed in the estate inventory.

¶ 30   Ken then recounted how he secured insurance for the business to handle the transfer appropriately. Ken called Koeller to "get options and a plan in place" since Ron had never secured business insurance before. Ken clarified that it was his decision to obtain business insurance because the business was being transferred to him at that time. Ken's attorney handed him a copy of the insurance application. The applicant was listed as "Kinzel Fabrication." Ken testified that this was the business's name at the time, and Ron was the sole proprietor. Ken testified that because the business and its assets had been conveyed to him, he was going to "add LLC to the end. It was going to be Kinzel Fabrication LLC." Ken began this process in January or February of 2019. In regard to the insurance application for the business, Ken ultimately obtained the requested business insurance, and it went into effect in October of 2018. Ken testified that the insurance was "product liability general insurance," which also covered "some equipment" and the "building and property."

¶ 31   Ken described the business as a custom fabrication business. Ken confirmed that he and Ron were the only workers at the shop, although Ken's wife had worked in the office handling paperwork in 2018, and his son had helped "as an extra hand in the shop" sometimes. Ken confirmed that his sisters were not involved in the business, and that his brother, Keith, was totally estranged from the family.

¶ 32   Ken testified that Ron got sick the week before Easter of 2018. According to Ken, Ron "tried to" work at first but could only manage "two or three hours" a day. By around the fall of 2018, Ron "would maybe come to the shop a half an hour in the morning and maybe he wouldn't

15

even." By this point, Ken was running the business. Ron died in February of 2019, and Ken continued to operate the business. Ken testified that, if he was "just an employee" of the business, he would not have kept working there. Pat "was not involved in [the business] much prior to [Ron's] death nor after." Pat died four months later, in June of 2019. During the four-month period between his father's and his mother's deaths, Ken ran the business. After the business had been transferred to him, Ken continued to get paid the same way he had always gotten paid: weekly, through the business bank account. Ken had been a joint owner on that account since 2012 and described himself as "somewhat" familiar with the account. Pat was also on the business bank account "because she was [Ron's] wife." Ken and Ron wrote checks on that account, and Ken continued to do so after Ron's death.

¶ 33    Ken testified that Kelly locked him out of the shop in July of 2019. According to Ken, Kelly "said she had a buyer for [Ron's] trucks, told [Ken] to bring her the keys, and [that] she wanted access to the shop so she could do an inventory. Argument ensued." Ken left and texted Kelly a few days later "because she said she would have copies made and get [him] a key," but Kelly responded that "she was not going to." Ken confirmed that, prior to Kelly locking him out of the shop, he was working at that location, all his equipment was at that location, and his work at that location was his principal source of income. Ken was initially "shocked" upon learning that Kelly had locked him out. Ken testified that he was scared, "very much" panicked, and had financial concerns.

¶ 34    As "everything that was within [his] fabrication business was at that shop location," Ken took steps to "save [his] livelihood," including having his lawyer "draft a letter on or about August 21, 2019, in an attempt to obtain some of [his] business property." At this point, Ken's lawyer handed him a copy of the August 21, 2019, letter that his prior counsel had sent to Kelly and her

16

attorney. Ken testified that he only offered to purchase items he now claimed had already been transferred to him during Ron's lifetime because he "was just trying to figure out how to keep going." Ken explained that his "life had just collapsed and [he] had to figure a way to keep going so [he] didn't lose the rest of it." He made "multiple various offers on getting *** those business assets back into [his] possession" in a "series of letters that followed" after his first letter. Ken characterized these offers as "settlement negotiations" that had ultimately proved "unfruitful." He insisted that it had always been his position that the business had been transferred to him while Ron was alive.

¶ 35    Since being locked out, Ken had only managed to retrieve one piece of equipment from the shop: the Hyd-Mech saw from the inventory list, a saw he had purchased in 2013. The same day Ken retrieved the saw, Kelly returned one of Ken's customer checks that she had taken and deposited, and Ken provided Kelly with his 2013 receipt for the saw. Ken could not remember the day this all took place but knew that it was "shortly after litigation ensued." Ken did not know the current location or condition of the rest of the business personal property, since he had not been on the shop property for "months." He did not believe the appraisal Kelly had commissioned on behalf of the estate included all the business assets that had been transferred to him during Ron's lifetime. The appraisal had excluded "a lot of peripheral [items] around the shop and on the grounds," "scrap iron," "new iron on the racks," a mower, "a Kawasaki mule," and a box trailer, all of which Ken believed had been transferred to him prior to Ron's death as part of the business transfer. Ken testified that the appraisal also included items which were not part of Ron's business, including three of Kathie's items and Ken's Hyd-Mech saw. Ken confirmed that he only retrieved the Hyd-Mech saw after it had been appraised.

17

¶ 36    Ken testified that Ron's business assets included various motor vehicles, including a 2002 Ford F-350 truck. Ken stated that he had bought his own vehicle with a loan before Ron transferred the business to him. Ken confirmed that the 2002 F-350 truck was still titled in Ron's name at the time of his death because the family did not locate the title in time to alter it before Ron passed away. However, Ken believed the truck had nevertheless been part of the business that Ron transferred to him before he died. Ken confirmed that there were other items on the appraisal list that he believed to have been transferred to him as part of the business before Ron died, but that were only titled in Ron's name, including a tow right manufacturing Hawk trailer. In fact, Ken testified that "with the exception of the three [items]" that were Kathie's, the rest of the items on the appraisal list were either business assets or Ken's personal assets.

¶ 37    At this point, Ken's attorney presented Ken with photographs he had taken of the shop after Ron had passed away. Ken identified various shop items from the photographs, all of which he testified belonged to him, either as personal assets or as business assets that Ron had transferred to him before his death. Some of these items were vehicles. Several of these items had not been included in the appraisal Kelly had commissioned on behalf of the estate. Ken testified that Ron had "told [him] all along that the shop was [his]," and that he was suing the estate "to uphold what was already done, what had been worked out for years." Ken emphasized that he "worked owner hours for minimum wage," and that he would not have done that if he thought the business was not going to be his. Ken asked the trial court to find that the business and all its tangible property had been transferred to him before Ron's death.

¶ 38    On cross-examination, Ken confirmed that he did not have documents showing that the business assets had been transferred to him. Upon seeing his prior attorney's August 21, 2019, letter, Ken conceded that it was possible that his LLC had been set up in March of 2019 instead of

18

in January of 2019. Ken agreed that, after beginning this new business, he ran it out of the shop until Pat's death. Ken admitted that, while working as a subcontractor for Ron, he sometimes had his meals, gas, and other personal expenses paid for out of the company account. Ken confirmed that he moved into his Illinois home in 2013 and spent "about four or five months" renovating it and living out of a camper in his backyard. Ken also confirmed that his parents passed away six years after he had moved into his Illinois home. When asked why he did not retrieve his items from his parents' home in the years leading up to their death, Ken answered that he was "still not done with [his] house." Ken expressed his understanding that he had been an owner, not merely an authorized signer, on the business account while his father was alive. Ken denied any knowledge of one of his parents' savings accounts being liquidated in April of 2019. Ken believed funds that had been taken out of his parents' checking account had been transferred to the business account. Ken admitted that he was not the "lone caregiver" for his parents, and that his sisters also helped with "driving them to appointments and things like that."

¶ 39 Ken testified that the revenue from his work between January 2019, when Ron passed away, and June 2019, when Pat passed away, went to the business account. Ken received that business account after Pat's death. Ken denied that Kelly had asked him to give her a rental rate for the shop before locking him out of the shop in July 2019. Ken also denied telling Kelly that he was working out of another location or that he had any contracts at that time. Kelly's attorney then attempted to question Ken about his offer to purchase items from the estate. However, Ken's attorney objected, claiming that Ken's letter and offer within constituted "settlement negotiations." Kelly's attorney disputed this characterization, arguing that the letter simply stated that "Ken would like to offer to purchase several of the items." Kelly's attorney emphasized that there was "no reference to attempt to settle" in the letter. The trial court allowed the testimony, "so long as

any offer that [was] testified to was not made as part of a settlement" and was just "a flat out offer by Ken to purchase items." When asked whether he had made any offers to purchase items on the appraisal list outside of settlement negotiations, Ken answered that he had not. Ken believed the items had been transferred to him by Ron via conversations between him and Ron taking place "[m]ultiple times through early [2018] and late [2017]." Ken testified: "It was a conversation between [Ron] and myself and it was already done."

¶ 40     Ken denied rejecting Ron's suggestion to transfer the business to him during his lifetime because it might have affected Ken's "ability to receive Medicaid." When asked whether part of the reason his paychecks were "at a certain amount" was so that he "would be able to continue to qualify for Medicaid," Ken answered that he did not know. Ken confirmed that, during his father's lifetime, including through the years 2017 and 2018, he had received weekly paychecks to his LLC, Kinzel Enterprises, LLC. He also confirmed that he continued receiving these paychecks to the same LLC after his parents' deaths. Ken also admitted that some of the items he had previously testified had been excluded from the estate appraisal could be covered by the appraisal's "catch-all entry." Ken confirmed that he had begun building his new workshop in August 2019, and that, as a result, it was no longer necessary for him to work at the old shop; however, Ken did emphasize that he had lost the old shop's "five acres of storage and buildings."

¶ 41     Ken confirmed that he "helped file the taxes for the business for the tax year 2018" by taking Pat to the accountant. Ken admitted that the business was still listed as Ron's on the 2018 taxes. Ken testified that this was "to keep consistency" until the family "figured out what was going on." Ken confirmed that the taxes had been filed in June of 2019, around the time Pat passed away. He admitted that he did not claim any of the business expenses or revenue on his personal taxes in 2018. Kelly's attorney then questioned Ken on his earlier testimony that he did not retrieve

20

his personal property items from his parents' home. Kelly's attorney asked whether Ken had retrieved some items he alleged to be his personal property, such as "the Bobcat." Ken answered that he "didn't take it from the property" but that he "just had it at [his] house."

¶ 42    Kelly's attorney then questioned Ken about an unspecified meeting with Ron's estate planning attorney, Paul Evans.[1] Ken confirmed that he, Kelly, Pat, and Ron were all present at this meeting. Ken testified that, although there was no discussion about transfer of the business assets, "there was talk of tax consequences for gifting or paying in full or whatever." Ken explained that he and Ron "were trying to figure out how to transfer the property, the real estate." Ken did not believe Evans provided any documents for Ron to take home. At the trial court's questioning, Ken testified that the Kawasaki mule did not have a title, only a certificate of origin. Ken testified that he was not paid "for the majority of 2019" and did not remember when he began doing payroll for the newly created Kinzel Fabrication, LLC. Ken confirmed that he now paid himself directly, not through Kinzel Enterprises, LLC. On redirect examination, Ken clarified that he kept paying himself through Kinzel Enterprises, LLC, for a while after his parents died because he "was too busy to change it," as he had "to keep a business afloat, take care of family, and *** get everything figured out." On recross-examination, Kelly's attorney asked Ken why he had gone "to the bank within days of [his] dad's funeral to change accounts." Ken testified that the bank asked him to bring Pat to handle "multiple accounts that [Pat] was the sole owner on since [Ron] passed away."

¶ 43    Kelly was then recalled as a witness. Kelly testified that she believed a disputed asset, "the Huskee mower," was not a personal asset of Ron's and not an asset of the business. Kelly also testified that, "on the date Ken took [Pat] to the bank to change [the] transfer on death" beneficiary

---

[1]During questioning, the date of this unspecified meeting was cited as "the day before Ron [went] to the hospital" in January 2019. However, after thorough review of the record, this court believes this meeting's date was confused with the date of a family meeting that took place at Ron and Pat's home.

of Ron and Pat's savings account, Pat selected Karen as the beneficiary. Kelly testified that, although there was $20,000 in the account when Pat assigned Karen as beneficiary, the account was empty by the time Pat passed away. As a result, "there was nothing in the savings account that was directed to Karen." Kelly also addressed the conversation she had with Ken before changing the shop's locks. Kelly testified that she had "asked [Ken] if he was working at the shop property. He said very little." According to Kelly, Ken told her that "he was not doing any work on site" and that he had no current contracts. Kelly asked Ken if they could "come to an agreement on renting the shop or the shop and the equipment together," and "suggested he give [her] a proposal"; however, "he never did propose anything." Kelly recalled that, sometime after that conversation, Ken made an offer of around $360,000 "to purchase the real estate outside of the estate." Kelly rejected this offer; the house alone ended up being sold for $489,000. The shop property was still owned by the estate. Kelly did not recall Ken making any offers regarding the business inventory outside of his August 21, 2019, letter.

¶ 44    Kelly recalled that Ron was "very concerned about keeping things equal, and he wanted to make sure that he set Ken up to be able to run the business after he was gone, but he was concerned about [the] girls being offended that it was not an equal split." Ron had planned to transfer the shop real estate to Ken, and the rest of the real estate to Kelly, Karen, and Kathie. Kelly testified that Evans and Ron had "a lot of discussion about *** the best way financially to do that, *** [whether it be] a straight up transfer, putting it in a will, [or] setting up the trust." Kelly confirmed that "there was no direct discussion as to whether the business in and of itself" had already been transferred "at that point in time" but recalled that Evans told her "about responsibilities as an executor and *** about how to inventory the equipment in the shop." Kelly testified that no documents were sent home or executed at the meeting but that "everybody took notes." The trial

22

court ordered that it would consider written closing arguments from the attorneys before issuing its final ruling.

¶ 45    In closing arguments, the basic dispute was summarized as such: "The issue is whether the items are Ken's outright—prior to equal division of the [e]states—or whether Ken instead receives them as part of his share." Both parties agreed that Ken needed to prove that the business personal property had been transferred to him before Ron's death by a preponderance of the evidence. In its final written order, issued on March 14, 2023, the trial court denied Ken's claim to the business personal property, finding that it had not been transferred to him before Ron's death:

> "Ron expressed the desire for Ken to have his business upon his retirement on several occasions, however, Ron passed away prior to retiring and none of Ron's business property was actually ever transferred by Ron, or anyone else, to Ken. The following undisputed evidence supports this conclusion. Ken did not have physical possession of the business property at issue at any relevant time. All vehicle and trailer titles remain in Ron or Ron and Pat's name still today. No documentary evidence of any transfer exists. Ron attempted to work until a couple of months before his death, as his health would allow. Ron signed all relevant checks from the business account, including the check to 'IPM' on 10/19/18. Ken admits that he was an independent contractor that received weekly payments from Kinzel Fabrication from years prior to Ron's death until after Pat's death. All of these payments were made from Kinzel Fabrication's account to Ken's entity of Kinzel Enterprises, L.L.C. Ken admits that when he started his own business, Kinzel Fabricating, L.L.C., after Pat's death, he began paying himself directly, rather than through Kinzel Enterprises, L.L.C. Throughout the lifetimes of Ron and Pat, their names were on the Kinzel Fabrication checking account. All tax returns filed concerning Kinzel Fabricating were associated with Ron, not Ken. Ken offered to purchase some of the business property after Pat's death that he now claims was transferred to him during Ron's life."

¶ 46    The trial court wrote that "Ken [based] his position primarily on the Affidavit of Brad Small." However, since Small had never met with Ron, the court concluded that the "information that Brad Small based his affidavit on came from Ken and Pat," and Ken himself had admitted that "Pat did not have much to do with Kinzel Fabricating before or after Ron's death." The court also reasoned that, if it were true that Ron had transferred the business to Ken before Ken obtained business insurance, "Ron would have [had] no part in the process." However, this was not the case,

23

as "Ron signed the check to IPM, not Ken." The court was similarly unpersuaded by Borrenpohl's testimony, as Borrenpohl appeared "to have had very limited contact with Ron or Ken." Additionally, the court noted that, at one point, "Borrenpohl testified that Ron told him that the building and the business were Ken's. At least a portion of Borrenpohl's statement [was] inaccurate as it [was] undisputed that no real estate was ever transferred to Ken by Ron or Pat during Ron's life." The court also found "inconsequential" the fact that the business checking account was owned by Ron, Pat, and Ken, as Ken had "testified that this was the situation for many years prior to the alleged transfer of the business by Ron to Ken." The court concluded that "evidence indicating that Ron transferred any part of his business to Ken during Ron's lifetime [was] virtually nonexistent other than for Ken's own self-serving testimony and statements made to others by Ken." Ken appeals.

¶ 47                                    II. ANALYSIS

¶ 48    On appeal, Ken argues that this court should vacate or reverse the trial court's denial of his claim to the business personal property where the trial court erroneously denied Pat's testamentary capacity; where the court wrongly considered his August 21, 2019, letter to Kelly and her attorneys; and where the court's finding that he failed to prove his claim by a preponderance of the evidence was against the manifest weight of the evidence.

¶ 49                        A. Denial of Testamentary Capacity

¶ 50    Ken first claims that the trial court erroneously denied Pat's testamentary capacity when it declined to consider her statement to Small that the business personal property was Ken's as irrefutable confirmation that the property had indeed been transferred to Ken before Ron's death. "[T]estamentary capacity consists of the ability to know and understand the natural objects of one's bounty [and] the nature and extent of one's property and to form a plan to dispose of the property."

24

(Internal quotation marks omitted.) *Estate of Howell v. Howell*, 2015 IL App (1st) 133247, ¶ 28. The presence of testamentary capacity in a testator is a rebuttable presumption. Lack thereof must be proven by the challenging party, who must first file a will contest within six months of the will being admitted to probate. See 755 ILCS 5/8-1 (West 2022). Failure to file a will contest within this six-month period deprives a trial court of jurisdiction to consider the challenge to testamentary capacity and establishes the validity of the will for all purposes. *In re Estate of Ellis*, 236 Ill. 2d 45, 54-55 (2009).

¶ 51    We agree with Ken that, in this case, the trial court lacked jurisdiction to consider a challenge to Pat's testamentary capacity, as no will contest was ever filed, let alone within six months of the will's admission to probate. However, we do not agree that the trial court's failure to accept Pat's statement to Small that the business property was Ken's as irrefutable fact constituted a challenge to her testamentary capacity. Pat's testamentary capacity was *never* challenged in this case, by either Kelly or the trial court. The trial court rightly accepted Pat's will as final and valid and abided by its terms. We agree with Kelly that it would be illogical to find that she would have needed to challenge Pat's will simply to counter Small's affidavit and testimony, neither of which were even a part of Pat's will.

¶ 52    Finally, we emphasize that testamentary capacity consists of the *ability* to know and understand the natural objects of one's bounty. Accepting that Pat had testamentary capacity does not mean accepting that Pat *actually knew* the natural objects of her bounty; it simply means accepting that Pat *had the ability to know* those objects. Neither Kelly nor the trial court challenged Pat's ability to understand the natural objects of her bounty. Therefore, Ken's argument that the trial court improperly challenged Pat's testamentary capacity fails.

¶ 53                        B. Admission of Settlement Letter

25

¶ 54 Ken next argues both that the trial court abused its discretion when it admitted a settlement offer into evidence, and that this error was not harmless because the court relied on this offer in making its final ruling. "As a general rule under Illinois law, matters relating to offers of settlement are inadmissible." *Cundiff v. Patel*, 2012 IL App (4th) 120031, ¶ 27. The inadmissibility of settlement negotiations is governed by Illinois Rule of Evidence 408 (eff. Jan. 1, 2011):

> "(a) Prohibited Uses. Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>> (1) furnishing or offering or promising to furnish—or accepting or offering or promising to accept—a valuable consideration in compromising or attempting to compromise the claim; and
>> (2) conduct or statements made in compromise negotiations regarding the claim.
> (b) Permitted Uses. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of settlement negotiations. This rule also does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness' bias or prejudice; negating an assertion of undue delay; establishing bad faith; and proving an effort to obstruct a criminal investigation or prosecution."

¶ 55 A trial court's decision to admit or exclude evidence will not be disturbed absent a clear abuse of discretion. See *Peach v. McGovern*, 2019 IL 123156, ¶ 25. An abuse of discretion occurs where the decision was arbitrary, fanciful, or unreasonable, or where no reasonable person would take the position adopted by the trial court. *Id.* Absent an abuse of discretion *resulting in substantial prejudice*, appellate courts leave the trial court's decision alone. See *Cadle Properties of Illinois, Inc. v. Fortune Investments, LLC*, 2021 IL App (1st) 200556, ¶ 35.

¶ 56                                    i. No Abuse of Discretion

¶ 57 The burden is on the party seeking exclusion of the evidence to make a substantial showing that it was an attempt to settle a disputed claim. See *Control Solutions, LLC v. Elecsys*, 2014 IL

26

App (2d) 120251, ¶ 38. In this case, the trial court admitted Ken's August 21, 2019, letter to Kelly and her attorneys at the October 7, 2022, claims hearing. Ken's attorney objected to the letter, arguing that it was a part of settlement negotiations. Ken's attorney pointed out that the letter referred to resolving "this dispute amicably and without resort to legal action." She stated that, although the letter did "not have in bold letters 'for settlement purposes only,' *** this [was] absolutely a settlement attempt *** in an effort to avoid the current litigation that [was] ongoing right now." There were no other attempts at making a substantial showing that the letter was a settlement offer. Thus, it was not an abuse of discretion for the trial court to find that Ken failed to make a substantial showing that the letter was a settlement offer. Neither was it an abuse of discretion for the trial court to admit the letter into evidence.

¶ 58                                    ii. Harmless Error

¶ 59    Even if Ken had made a substantial showing that the August 21, 2019, letter was a settlement offer, and the trial court nevertheless admitted the letter into evidence, this court still would not disturb the trial court's decision. This is because the letter's admission did not result in substantial prejudice to Ken. Ken argues that the trial court's final "decision relied on [the] settlement offer," and thereby, that the letter's admission into evidence resulted in substantial prejudice to him. However, the only reference to the letter made in the whole of the trial court's nine-page final ruling was this sentence: "Ken offered to purchase some of the business property after Pat's death that he now claims was transferred to him during Ron's life." Several other factors were cited as reasoning for the trial court's final ruling. We find that the brief mention of the letter was not enough to constitute substantial prejudice to Ken.

¶ 60              C. Transfer of Business Personal Property

27

¶ 61 Finally, Ken argues that the trial court's determination that the business personal property was not transferred to him before Ron's death was against the manifest weight of the evidence. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). Ken argues that the trial court wrongfully ignored the testimony and Small's affidavit, thereby denying Pat's testamentary capacity. In his memorandum, Ken explains that "by ignoring Pat's testamentary capacity, regardless of the other evidence[,] the trial court *** makes its decision against the manifest weight of the evidence. If the trial court had given the proper weight to the evidence of Pat's testamentary capacity, its decision would have had to have been that the business personal property was transferred to Ken during Ron's lifetime." We have already addressed Ken's assertion that the trial court denied Pat's testamentary capacity above, and we disagree. We also disagree that the trial court ignored Small's testimony and affidavit. In its final ruling, the trial court specifically writes:

> "Ken bases his position primarily on the Affidavit of Brad Small. However, Brad Small never met or spoke to Ron, as his first interaction with the family was after Ron's death. The information that Brad Small based his affidavit on came from Ken and Pat, and Ken admits that Pat did not have much to do with Kinzel Fabricating before or after Ron's death."

¶ 62 The trial court thoroughly considered the evidence presented and found that "evidence indicating that Ron transferred any part of his business to Ken during Ron's lifetime [was] virtually nonexistent other than for Ken's own self-serving testimony and statements made to others by Ken." By contrast, the trial court cited several factors in favor of its ruling to deny Ken's property claims:

> "Ken did not have physical possession of the business property at issue at any relevant time. All vehicle and trailer titles remain in Ron or Ron and Pat's name still today. No documentary evidence of any transfer exists. Ron attempted to work until a couple of months before his death, as his health would allow. Ron signed all relevant checks from

28

the business account, including the check to 'IPM' on 10/19/18. Ken admits that he was an independent contractor that received weekly payments from Kinzel Fabrication from years prior to Ron's death until after Pat's death. All of these payments were made from Kinzel Fabrication's account to Ken's entity of Kinzel Enterprises, L.L.C. Ken admits that when he started his own business, Kinzel Fabricating, L.L.C., after Pat's death, he began paying himself directly, rather than through Kinzel Enterprises, L.L.C. Throughout the lifetimes of Ron and Pat, their names were on the Kinzel Fabrication checking account. All tax returns filed concerning Kinzel Fabricating were associated with Ron, not Ken. Ken offered to purchase some of the business property after Pat's death that he now claims was transferred to him during Ron's life."

Considering this extensive reasoning, we do not find that the trial court's determination that the property had not been transferred to Ken before Ron's death, and its resulting decision to deny Ken's property claims, were against the manifest weight of the evidence.

¶ 63                                    III. CONCLUSION

¶ 64    Therefore, the order of the circuit court of Washington County denying the appellant's business personal property claims against the estates of Ronald and Patricia Kinzel is affirmed.

¶ 65    Affirmed.