# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black;">

### *Cadle Properties of Illinois, Inc. v. Fortune Investments, LLC*, 2021 IL App (1st) 200556

</div>

| | |
|---|---|
| Appellate Court Caption | CADLE PROPERTIES OF ILLINOIS, INC., an Assignee of MB Financial Bank, N.A., Plaintiff-Appellee and Counter-Appellant, v. FORTUNE INVESTMENTS, LLC, an Illinois Limited Liability Company; M. ABDUL MATHIN; ANAA HOLDINGS XI, LLC; BASS FINANCIAL CORPORATION; JPMORGAN CHASE BANK, N.A., an Assignee of MERS, as Nominee for Countrywide Bank, N.A.; NATIONSTAR MORTGAGE, LLC, as Assignee of MERS, as Nominee for Countrywide Bank, N.A.; BEN H. ARKES; PNC BANK, N.A.; TELESIS COMMUNITY CREDIT UNION; SKOKIE GARDENS CONDOMINIUM ASSOCIATION; and UNKNOWN OWNERS and NONRECORD CLAIMANTS (Fortune Investments, LLC, and M. Abdul Mathin, Defendants-Appellants and Counter-Appellees). |
| District & No. | First District, First Division<br>No. 1-20-0556 |
| Filed | June 7, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CH-7186; the Hon. Daniel J. Kubasiak, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

John D. Silk, of Rothschild, Barry & Myers, LLP, of Chicago, for appellants.

Robert G. Markoff and Douglas C. Giese, of Markoff Law, LLC, of Chicago, for appellee.

Panel

JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Walker and Justice Coghlan concurred in the judgment, and opinion.

## OPINION

¶ 1 Fortune Investments, LLC (Fortune), borrowed $17 million from MB Financial Bank, N.A. (MB Financial), to construct a condominium development. Fortune's owner, M. Abdul Mathin, guaranteed the loan and completion of the project. Fortune defaulted and MB Financial sued to foreclose. Cadle Properties of Illinois, Inc. (Cadle), purchased the loan from MB Financial and entered into a settlement agreement with Fortune, which provided, in part, that Cadle would not sue Fortune on the loan or Mathin on his guaranties until after all condominium units sold. (Fortune and Mathin will be referred to as "Mathin.") Cadle also agreed to pay expenses related to the property, including real estate taxes, insurance, and utilities.

¶ 2 Several years later, Cadle filed a verified complaint alleging that Fortune had breached the construction note and Mathin had defaulted on his payment and completion guaranties. (Cadle also sued to foreclose the mortgage, but the parties settled and dismissed that claim.) Mathin filed affirmative defenses and counterclaims alleging that Cadle's filing of the lawsuit before all units had sold breached the settlement agreement. Specifically, Mathin alleges he transferred, but did not sell, 17 units to ANAA Holdings V, LLC (ANAA), a company owned by his wife but rather, refinanced to help Cadle pay off a loan. Mathin further alleges that Cadle failed to pay expenses as required by the settlement agreement.

¶ 3 After a bench trial, the court entered judgment for Cadle and awarded damages of $17,031,611.66. The court rejected Mathin's affirmative defenses and counterclaims, finding Cadle filed its lawsuit after ownership of the 17 units changed from Fortune to ANAA, satisfying the condition precedent in the settlement agreement. As to expenses, the court found that all expenses were paid following a course of action to which the parties agreed or Mathin had not challenged.

¶ 4 Mathin contends the trial court erred in (i) entering judgment for Cadle based on finding all conditions precedent were met, (ii) entering judgment for Cadle on the note when it presented evidence regarding only the settlement agreement, (iii) calculating damages, and (iv) finding Cadle had paid all property expenses. Applying the manifest weight of the evidence standard, we affirm the trial court's findings (i) that all units had been sold or transferred before Cadle filed its complaint, (ii) that expenses were paid in the manner agreed on by the parties, and (iii) on damages and the judgment.

BACKGROUND

¶ 6     In 2003, Fortune took out a $17 million construction loan from MB Financial, to develop Skokie Gardens Condominiums, a 70-unit residential development. A construction mortgage note secured the loan. Mathin, a member, manager, and agent of Fortune, signed the note and guaranteed payment of the loan and completion of the project. The note stated that interest would accrue at a variable annual interest rate equal to one-half of 1% over the rate of interest then most recently announced by MB Financial but would not be less than 5% per year.

¶ 7     About a year later, MB Financial sued to foreclose the mortgage. While that lawsuit progressed, MB Financial assigned all loan documents, including the note and guaranties, to Cadle for $15 million. Cadle borrowed $12 million from MB Financial to finance the purchase. MB Financial later assigned Cadle's loan to Colfin Bulls Funding B, LLC (Colfin).

¶ 8     Cadle then entered into a settlement agreement with Fortune and Mathin to dismiss MB Financial's foreclosure case. The settlement agreement stated that Fortune owed Cadle $18,618,026.01 and proceeds from unit sales would be applied to pay down the loan. Interest would accrue at an annual rate of prime, as published by the *Wall Street Journal*, plus 2%. Also relevant, the agreement limited when Cadle could sue to foreclose:

> "If the Debt is not paid in full to Cadle on or before October 15, 2006, both Fortune and Mathin will be responsible for any remaining amounts owed to Cadle, but only in the event, there is a deficiency after Cadle has sold any remaining unsold Units. Cadle shall not file an action against Fortune or Mathin under the Loan Documents for any deficiency prior to October 14, 2006." (A modification provided Cadle would not file suit on the loan before October 2007.)

In addition, Cadle would "pay all reasonable expenses associated with the Property, including, but not limited to, real estate taxes, insurance, association/management fees, repair costs, and utility charges." Charges Cadle paid would be added to the debt.

¶ 9     In 2012, Cadle sued to foreclose. By letter agreement dated May 29, 2012, Cadle agreed to release its security interest in 17 units and to dismiss the foreclosure lawsuit in exchange for a $1.2 million payment. Fortune borrowed $1.2 million from Pensam Logistics Partners (Pensam), and Cadle used the $1.2 million to help pay off its loan with Colfin, which was demanding payment. According to Mathin, Pensam would not make a loan to Fortune, so he transferred the 17 units to ANAA, a company owned by his wife. The letter agreement stated that the $1.2 million payment would reduce the balance on the loan but would not be construed as satisfaction or release of the indebtedness, and the loan documents would otherwise remain in full force and effect.

¶ 10     In January 2015, Cadle sent letters to Fortune and Mathin, advising of default and demanding cure within 35 days. When they failed to cure, Cadle filed a three-count verified complaint. Cadle alleged Fortune breached its obligations under the note (count I) and Mathin defaulted on the payment and completion guaranties (count II). Cadle also sought to foreclose the mortgage (count III). Cadle requested damages of over $14.6 million as of April 23, 2015, together with *per diem* interest of $1793.32 accruing after that date.

¶ 11     Mathin filed three affirmative defenses: (i) the statute of limitations barred the complaint, (ii) Cadle failed to perform a condition precedent under the settlement agreement by filing the complaint before all units sold, and (iii) Cadle breached the settlement agreement by failing to

¶ 12 pay property expenses. Mathin also filed a counterclaim alleging Cadle breached the settlement agreement by filing the lawsuit before all units sold.

¶ 12 Having settled and dismissed count III on the mortgage foreclosure claim, a two-day bench trial proceeded on the remaining counts and the counterclaim. At trial, John Benetis, an account officer for Cadle, testified that when he took over the Fortune loan in 2013, the loan balance numbers were incorrect, so he went over the loan documents and payments and created a spreadsheet to reflect the amount Fortune owed accurately. Fortune had not paid the balance of the loan, and all units had either been sold or, as in the case of the 17 units, held by ANAA. On cross examination, Benetis acknowledged that, unlike other units, the 17 units were not sold individually with separate closing statements but instead, as a group, were turned over to ANAA in exchange for $1.2 million and Cadle's agreement to release its lien on those units. Benetis also acknowledged that Cadle's ledger book, entered into evidence, did not list a sales price for the 17 units. Cadle credited Fortune $70,588.24 ($1.2 million divided by 17) for each unit; other units had sold for $250,000 or more.

¶ 13 Benetis acknowledged that under the settlement agreement, Cadle would add to the debt reasonable property expenses it paid. But expenses were paid in various ways—either by Cadle directly, by Mathin, or out of the closings on units—and Mathin never objected to paying the expenses himself or out of the closing. To avoid confusion because all expenses were eventually paid, the expenses were not added to the debt.

¶ 14 Relying on his spreadsheet, after all credits were applied, Benetis said Fortune owed Cadle $16,971,145.20. On August 28, 2017, the spreadsheet showed Fortune owed $12,226,231.36 in principal and $3,172,316.58 in interest for a total of $15,398.04. Benetis added a *per diem* interest of $1782.99 to derive his final tally. On cross-examination, Benetis acknowledged his calculations were based on the 2006 settlement agreement and not on the loan documents, which Cadle never obtained from MB Financial.

¶ 15 Mathin testified that, with Cadle's approval, the 17 units were transferred to ANAA and not sold by Fortune, so the units could be refinanced to generate the $1.2 million Cadle needed to pay off its loan to Colfin. He asserted that the value of each unit far exceeded the $70,588.24 Cadle credited to Fortune and they were refinanced rather than sold. He believed payment of the $1.2 million for the 17 units fully satisfied his obligations to Cadle on the debt, despite the language of the letter agreement stating the loan remained in full force and effect.

¶ 16 Daniel Cadle, chairman of the board of the company, testified that his attorneys advised him that Fortune had sold all condominium units before Cadle filed its complaint. Over objection, the trial court entered into evidence an escrow trust disbursement statement for the May 2012 transaction from Chicago Title and Trust Company, listing ANAA as "Buyer" of the 17 units. Daniel Cadle testified he believed Fortune sold those units to ANAA, and while he knew of the units moving to ANAA at the time, he did not authorize it.

¶ 17 Daniel Cadle testified that expenses were paid in one of three ways—by check from Cadle to Fortune, during closings on condominium units, or by Mathin. Neither Mathin nor Fortune complained about these methods and never accused Cadle of violating the settlement agreement.

¶ 18 On cross-examination, Daniel Cadle acknowledged the escrow trust disbursement statement does not list a seller or show payment of transfer stamps. He also acknowledged average sales price for units was $250,000, and not the $70,588.24. Cadle credited Fortune for each unit. Cadle applied the $1.2 million loan Fortune received from Pensam toward repaying

- 4 -

the Colfin loan, which was in default. On cross-examination, Daniel Cadle said he believed about $13 million of the nearly $17 million Fortune owed Cadle was in interest.

¶ 19 After closing arguments, the trial court entered a written opinion and order in favor of Cadle counts I and II and against Fortune on its counterclaim. The court found that Cadle presented credible evidence Fortune breached its obligations under the note and that the balance was due. As to the affirmative defense and counterclaim that not all units had been sold, the court found

> "documents were presented and entered into evidence that the 17 properties at issue were transferred on May 30, 2012, to ANAA Holdings V, LLC, a business owned by Mathin's spouse. Mathin characterized this as a refinancing rather than a sale. Regardless of Mathin's characterization, evidence and testimony support a sale and change in ownership of the 17 properties which overcomes Defendants' condition precedent argument."

¶ 20 As to Mathin's assertion that Cadle breached the settlement agreement by not paying all expenses, the trial court found the

> "[t]estimony and evidence admitted established that all expenses were paid pursuant to a course of action either agreed upon by the parties or not challenged by Mathin at any time prior to this action. Regardless of the timing of the defense, the evidence confirmed that Plaintiff paid all reasonable expenses under the Settlement Agreement."

The trial court entered judgment for Cadle for $17,031,611.66, which included principal, interest, attorney's fees, and court costs.

¶ 21 ANALYSIS

¶ 22 Standard of Review

¶ 23 After a bench trial, we reverse a judgment only if it is against the manifest weight of the evidence. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 51 (2009). " 'A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence.' " *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59 (quoting *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002)). "The manifest weight of the evidence standard affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony." *Id.*

¶ 24 Were Conditions Precedent for Lawsuit Met?

¶ 25 The parties do not dispute that the 2006 settlement agreement imposed a condition precedent requiring all units be sold before Cadle could sue Fortune on the loan and Mathin on his guaranties. The parties also agree that in May 2012, the parties entered into a letter agreement, which provided that Cadle would release its lien on 17 units in exchange for $1.2 million and, in connection with that transaction, that title to the 17 units changed from Fortune to ANAA. They disagree, however, as to whether the May 2012 transaction constituted a sale satisfying the condition precedent, as Cadle contends, or a refinance approved by Cadle, as Mathin contends.

¶ 26 Mathin asserts that the trial testimony supports a finding that the May 2012 transaction constituted a refinance. Mathin notes that Benetis called the transaction a "transfer," and although Daniel Cadle testified that the transaction was a "sale" to which he did not consent, Cadle presented no documentary evidence to support that contention. Indeed, Mathin asserts that the documentary evidence supports a refinance. First, Mathin notes that the disbursement statement does not list a "seller" and, although it lists ANAA as the "buyer," ANAA is referred to as a "borrower" elsewhere in the document. Further, the disbursement document shows nothing regarding payment of transfer taxes or prorations for assessments, insurance, or real estate taxes, as had the closing statement for sales of other units. And the disbursement document shows the title company issued only a loan policy when real estate sales usually require an owner's policy.

¶ 27 Mathin also asserts that Cadle's ledger, which lists the status of all the units, establishes the transaction was a refinance. In particular, Mathin contends that while the ledger lists sales prices for most units ranging from $230,00 to $358,000, the sales prices for the 17 units are marked "na" and, instead, Cadle assigned a credit of $70,588.24 for each unit. Mathin asserts that Cadle's different treatment of the 17 units in its own records shows the transaction was not a sale. He insists as well that treating the transaction as a sale defeats the purpose of the condition precedent in the settlement agreement. According to Mathin, the purpose was to reduce the amount Fortune owed under the loan as much as possible before liability kicked in and giving credit for $70,588.24 per unit rather than the average sales price of $250,000 increased the amount of their liability.

¶ 28 The parties disagree about whether the May 2012 transaction constitutes a refinance or a sale, but neither defines those terms. According to Black's Law Dictionary, a "refinancing" is "[a]n exchange of an old debt for a new debt, as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan." Black's Law Dictionary 1533 (11th ed. 2019). And a "sale" is a "transfer of property or title for a price." *Id.* at 1603. So, in a refinancing, an owner retains title to property and replaces an old debt with a new debt. A sale, in contrast, requires a transfer of title.

¶ 29 Mathin concedes that before the May 2012 transaction, Fortune had title to the 17 units, and after the transaction, ANAA held title. A review of the Cook County Recorder website, of which we may take judicial notice (*Kopnick v. JL Woode Management Co.*, 2017 IL App (1st) 152054, ¶ 26), shows the units were conveyed by special warranty deed from Fortune to ANAA on May 31, 2012. That constituted a "transfer of *** title for a price" and supported the trial court's finding of a sale. Had Fortune retained title to the units and acquired the loan from Pensam to repay its loan to Cadle, the transaction could be deemed a refinancing. Further, although Mathin contends the $70,588.24 credit Fortune received for each unit was not a fair market price to support his argument, he fails to explain why Fortune did not negotiate a higher price for the 17 units. Indeed, the record shows that before the May 2012 transaction, Fortune last sold a unit in May 2010 for $265,000. Fortune's apparent inability to sell units in the intervening two years suggests the amount Cadle credited Fortune for not a single unit but for 17 units was reasonable.

¶ 30 Echoing his trial testimony, Mathin asserts that the transaction was a refinancing and Fortune transferred the units to ANAA, with Cadle's consent, because Pensam would not loan $1.2 million to Fortune. And that, without that loan, Cadle could not have cured its default with Colfin. But no other witness supports the claim that the 17 units were transferred to

ANAA solely to refinance the units to benefit Cadle or that Cadle approved the conveyance. Benetis testified that all units had either been sold or transferred. Daniel Cadle testified he believed all units had sold and did not consent to Fortune transferring the 17 units to ANAA.

¶ 31 At best, the documentary evidence is inconclusive. As Mathin notes, the Chicago Title escrow trust disbursement statement lists ANAA as the "buyer" and does not list a seller. However, it is undisputed that title to the units changed. Cadle's ledger indicates it treated the 17 units collectively as contrasted to individual units sold to third parties.

¶ 32 In short, Mathin argues that the trial court incorrectly found the testimony and evidence of Cadle as more credible than his side's testimony and evidence. This argument does not support finding the trial court's decision as against the "manifest weight of the evidence." We grant deference to the trial court's decision because the trial court was in a superior position to determine and weigh witness credibility and demeanor and resolve conflicts in their testimony. *Wade*, 2017 IL App (1st) 161765, ¶ 59. The trial court found that the "evidence and testimony support a sale and change in ownership of the 17 properties which overcomes Defendants' condition precedent argument." This finding was not against the manifest weight of the evidence.

¶ 33                    Admission of Disbursement Statement Into Evidence

¶ 34 Mathin contends the trial court abused its discretion by admitting the escrow trust disbursement statement into evidence. Specifically, Mathin argues the document was not part of the exhibit list, and Cadle and its attorneys waited until the second day of trial to "spring" it on him, rather than disclosing the night before when they discovered it. Mathin asserts this precluded him from preparing to cross-examine Cadle about it, to ask earlier witnesses about it, or to present other documents from that closing to dispute it.

¶ 35 Illinois Rule of Evidence 402 (eff. Jan. 1, 2011) states that "[a]ll relevant evidence is admissible, except as otherwise provided by law." Relevant evidence is evidence tending to make the existence of a material fact more or less probable than it would be without the evidence. *Wojcik v. City of Chicago*, 299 Ill. App. 3d 964, 971 (1998). The relevance and admissibility of evidence at trial fall within the trial court's discretion. *Id.* Absent an abuse of that discretion resulting in substantial prejudice, we leave the trial court's decision alone. *Id.* An abuse of discretion occurs where no reasonable person would take the position adopted by the trial court. *Peach v. McGovern*, 2019 IL 123156, ¶ 25.

¶ 36 The disbursement statement related to whether the May 2012 transaction was a sale or refinancing. Cadle presented the document to refute Mathin's testimony the day before calling the May 2012 transaction a refinancing and not a sale. Indeed, Mathin acknowledges its relevance, as he asserts it supports his contention the transaction was a refinancing and disproves Cadle's assertion that it was a sale. Further, the trial court's admitting it into evidence caused no prejudice. As the trial court noted, the document was produced in discovery and could have been used by either party. Moreover, the trial court permitted Mathin's attorneys to recall him as a witness to ask about the document, and they declined. Given the document's relevance to the key issue and the availability of the document to both parties, the trial court appropriately exercised its discretion by allowing Cadle to admit it into evidence.

¶ 37                    Breach of Note vs. Breach of Settlement Agreement

¶ 38      Mathin contends that the trial court erred in entering judgment for Cadle on the mortgage note when Cadle's evidence related only to the settlement agreement. Mathin asserts that Cadle could have either sued under the settlement agreement or the note but should not have been permitted to sue under the note and then present evidence related only to the settlement agreement. For support, Mathin cites a line of cases holding that when the parties to a contract enter into a settlement agreement, the plaintiff may only sue under the settlement agreement. *Towne v. Town of Libertyville*, 190 Ill. App. 3d 563, 570 (1989). Another line of cases holds that if a party's breach goes to an essential element of the settlement, effectively amounting to a refusal to perform or an abandonment, the other party may elect to regard the agreement as rescinded and proceed on the original cause of action or may sue on the agreement for the breach. *Hopkins v. Holt*, 194 Ill. App. 3d 788, 796-97 (1990).

¶ 39      Mathin contends Cadle should have been required to pick a lane—either sue under the note or the settlement agreement. In particular,Mathin asserts Benetis testified that when he was calculating the amount Fortune owed, he relied on the terms of the settlement agreement, not the loan. But key differences between the note and the settlement agreement significantly affect the damages calculation. Namely, under the settlement agreement (i) damages included costs not included in the note; (ii) the interest rate was prime plus 2%, while the note provided for an interest rate of prime plus 0.5%; and (iii) Cadle was required to pay property expenses under the settlement agreement but not the note.

¶ 40      To prove breach of contract, a plaintiff must establish (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) a breach by the defendant, and (iv) the defendant's breach resulted in damages. *Unterschuetz v. City of Chicago*, 346 Ill. App. 3d 65, 69 (2004). Mathin contends that Cadle established the existence of a contract—that is, the note and guaranties—but failed to establish a breach or resulting damages when it presented evidence related solely to the settlement agreement. We disagree.

¶ 41      The settlement agreement states that the "Loan Documents, including the Note, guaranties and the Mortgage, shall remain in full force and effect. However, if any of the terms of this Agreement are in conflict with the terms of the Loan Documents, the terms of this Agreement shall control." Thus, the note and guaranties remained in effect, and Cadle was permitted to sue for breaching them. But, if a conflict arose between the note and the settlement agreement, as it did regarding the applicable interest rate and the payment of expenses, the settlement agreement clarified it controlled. The trial court properly held that Fortune and Mathin breached their obligations under the note and guaranties and then—to calculate damages—permitted Cadle to present witnesses and evidence on the terms of the settlement agreement.


¶ 42                                        Damages

¶ 43      Mathin argues that the trial court's award of damages was manifestly erroneous and not supported by the evidence. According to Mathin, the trial court's opinion indicates that over $12 million of the award is the principal balance due and just under $5 million is the interest due, but the evidence at trial showed the opposite—Daniel Cadle testified that $13 million of the $17 million Fortune owed was for interest. Mathin further describes the amount Cadle claimed due and owing throughout the trial to have been a "moving target." Mathin contends Cadle did not meet its burden to establish a reasonable basis for computing damages, noting

that Benetis testified Cadle had issues with the accounting on the loan before he took over the loan in 2013.

¶ 44       A breached contract entitles the injured party to be placed in the position he or she would have been had the contract been performed. *Wilson v. DiCosola*, 352 Ill. App. 3d 223, 225 (2004). The plaintiff has the burden of establishing a reasonable basis for computing damages. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 107 (2006). Damages must be proved with reasonable certainty and cannot be based on conjecture or speculation. *Id.* We consider an award of damages made after a bench trial under the manifest weight of the evidence standard. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). A factual finding is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Eychaner*, 202 Ill. 2d at 252. If there is an adequate basis in the record to support the trial court's determination of damages, then we must affirm. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13.

¶ 45       Benetis acknowledged Cadle's records were inaccurate when he took over the loan. Still, he reviewed the loan documents and Fortune's payment history and created a spreadsheet accurately reflecting the amount owed by Fortune. That spreadsheet showed that, as of August 2017, Fortune owed more than $12 million in principal and $3 million in interest. Relying on the spreadsheet, Benetis testified that on August 28, 2017, Fortune owed a total of $15,398,548.04 and, after additional interest, $16,971,145.20 at the time of trial. We agree with Fortune that Benetis's testimony and the documents he relied on conflicted with Daniel Cadle's assertion that most of the amount owed was interest. But, as noted, the trial court appraises the credibility of the witnesses, determines the weight to be accorded their testimony, and resolves inconsistencies and conflicts. *Wade*, 2017 IL App (1st) 161765, ¶ 59. After considering the documentary evidence, weighing witnesses' credibility, and resolving conflicts between Benetis's and Daniel Cadle's testimony, the trial court found Fortune owed Cadle $17,031,611.66, including $12,226,231.36 in principal, $4,744,915.60 in interest, plus attorney's fees and court costs. That finding was not unreasonable, arbitrary, or unsupported by evidence.

¶ 46                                                    Expenses

¶ 47       Mathin contends the trial court's judgment in Cadle's favor on its counterclaim was against the manifest weight of the evidence and should be reversed. Specifically, Mathin asserts that the documentary evidence and his testimony, along with the testimony of Benetis, show Fortune paid certain expenses Cadle never reimbursed.

¶ 48       Benetis testified that Mathin never objected to paying the expenses himself or out of the closing, and all expenses were eventually repaid. Daniel Cadle similarly testified that the parties used various methods in dealing with the expenses and neither Mathin nor Fortune complained about these methods or accused Cadle of violating the settlement agreement. Aside from his testimony that Fortune was never reimbursed for various expenses, Mathin presented no evidence to support the counterclaim. The trial court's finding that the "[t]estimony and evidence admitted established that all expenses were paid pursuant to a course of action either agreed upon by the parties or not challenged by Mathin" was not against the manifest weight of the evidence.

¶ 49          Affirmed.