**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240165-U

Order filed April 24, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| WOOD RIVER, LLC, a Delaware limited liability corporation, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0165 Circuit No. 18-MR-1624 |
| | ) | |
| SFA HOLDINGS, INC., f/k/a SAKS INCORPORATED, a Tennessee corporation, | ) ) ) | Honorable Anne Therieau Hayes, Judge, Presiding. |
| Defendant-Appellant. | ) ) | |

_____

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Brennan and Justice Davenport concurred in the judgment.
_____

**ORDER**

¶ 1     *Held*: The circuit court properly determined that (1) plaintiff could enforce the guaranty against defendant, (2) defendant was not entitled to an offset for the proceeds of the sale of the property, (3) the evidence of the general ledgers introduced at trial supported the damages awarded to plaintiff for operating expenses, and (4) a 9% per annum pre-judgment interest rate applied.

¶ 2     Plaintiff, Wood River, LLC (Wood River), substituted into this action to recover for breach of a corporate guaranty, under which defendant, SFA Holdings, Inc. (Saks), was the guarantor.

Following a bench trial, the circuit court of Du Page County entered judgment in favor of Wood River. As part of its judgment, the circuit court found that Wood River could enforce the guaranty against Saks and awarded Wood River damages, some of which served as recovery for unpaid rent and operating expenses related to the subject property. The circuit court denied Saks an offset for the proceeds of the sale of the property and applied a 9% per annum pre-judgment interest rate. For the following reasons, we affirm.

¶ 3                    I. BACKGROUND

¶ 4                 A. The Lease and Guaranty

¶ 5    In 1985, Chicago Title & Trust Company (Chicago Title) and Six Anchors Limited Partnership (Six Anchors), the predecessors-in-interest of C.R. Center, L.P. (C.R. Center), executed a commercial lease (Lease) in which it agreed to lease a section of the Yorktown Center Mall (Property) to CPS Realty, the predecessor-in-interest of Carson Pirie Scott & Company, in turn a subsidiary of The Bon-Ton Stores, Inc. (Bon-Ton). The Lease, which was later amended twice, required CPS Realty to pay an annual basic rent of $1,899,405 from August 1, 2008, through January 31, 2024.

¶ 6    Alongside the second amendment to the Lease, Proffitt's, Inc. (Proffitt's), Saks's predecessor-in-interest, executed a corporate guaranty (Guaranty), pursuant to which Proffitt's agreed to make "full and prompt payment" of all amounts owed by the tenant under the Lease, if the tenant failed to pay. The Guaranty designated WEC 98C-1 LLC (WEC) as "Landlord," explaining that WEC had since purchased the Property from Chicago Title and Six Anchors. The Guaranty also provided as follows:

> "This Guaranty is an absolute and unconditional guaranty of payment (and not of collection) and of performance and is a surety agreement.

2

This Guaranty shall be a continuing Guaranty, and (whether or not Guarantor shall have notice or knowledge of any of the following) the liability and obligation of Guarantor hereunder shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be subject to any reduction, limitation, termination, defense, offset, counterclaim or recoupment as a result of \*\*\* any assignment [of the Lease] \*\*\*.

***

This Guaranty shall be legally binding upon Guarantor and its successors and assigns and shall inure to the benefit of Landlord and its successors and assigns."

¶ 7                                    B. Default and Bankruptcy

¶ 8        On February 4, 2018, Bon-Ton filed for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware (Bankruptcy court). In September 2018, the Bankruptcy court granted Bon-Ton's motion to reject the Lease, effective August 30, 2018. As of when the motion was granted, Bon-Ton had paid $141,324.78 toward the basic rent for February 2018 and the full basic rent for March through August 2018. To date, Bon-Ton has not paid any money under the Lease for September 2018 onward; nor has Saks paid any money under the Guaranty.

¶ 9                        C. Filing of This Action and Pretrial Proceedings

¶ 10        On November 19, 2018, C.R. Center filed a complaint against Saks, alleging breach of the Guaranty and seeking declaratory judgment to recover the amounts owed under the Guaranty. C.R. Center and GMAC 2004-CA Yorktown Mall, LLC (GMAC) subsequently executed a deed in lieu of foreclosure, pursuant to which C.R. Center assigned the Guaranty and the claims in this action

to GMAC. GMAC then filed a motion to substitute as plaintiff, which the circuit court granted following no objection by Saks.

¶ 11    In response to a third amended complaint filed by GMAC, Saks filed an answer asserting the affirmative defense that GMAC had failed to mitigate any damages that might have resulted from Bon-Ton's breach of the Lease. GMAC later filed a motion for partial summary judgment on the two issues of whether Saks was liable under the Guaranty and whether Saks could prevail on its affirmative defense. Following a hearing on the motion, the circuit court awarded GMAC summary judgment on the issue of liability and denied summary judgment on the issue of Saks's affirmative defense.

¶ 12    On April 13, 2022, GMAC and SCG Investment Holdings LLC (Synergy) executed an agreement whereby Synergy purchased the Property for a price of approximately $4.35 million. Five days later, GMAC and Wood River entered into a separate agreement in which GMAC assigned the Guaranty and its claims in this action to Wood River for a price of approximately $4 million. Shortly thereafter, Wood River and GMAC filed a joint motion to substitute Wood River as plaintiff in this action. At the hearing on the motion, counsel for Saks stated that he was "not sure [Saks would] ultimately have an objection," but that there were certain circumstances surrounding the motion that "[gave] him a bit of pause," including that Wood River had been formed only a week prior. Counsel for Saks also requested additional discovery "to protect Saks'[s] rights that GMAC [would] not be asserting anything under [the Guaranty]." The circuit court agreed with counsel for GMAC that it did not appear that Saks was objecting to the joint motion for substitution and then granted the motion and permitted Wood River to substitute as plaintiff.

¶ 13    In January 2023, Saks filed a motion for summary judgment arguing that Wood River could not enforce the Guaranty because Wood River did not acquire the Lease and the Guaranty was not

4

assignable. Saks further argued that Wood River could not recover the rental payments that became due under the Lease after the date the Property was sold because the sale materially changed Saks's risk under the Guaranty and GMAC had failed to adequately mitigate its damages. Finding that Wood River was entitled to enforce the Guaranty and that there was a genuine issue of fact related to the issue of damages, the circuit court denied the motion for summary judgment and set the matter for a bench trial.

¶ 14                                    D. Bench Trial

¶ 15        Trial commenced on March 13, 2023. During its case-in-chief, Wood River presented six witnesses, including Randy Olsen, the manager of the Property; Charles Hodgkins, a representative of Wood River; Michael Wesley, a broker who worked on behalf of C.R. Center and GMAC to lease and sell the Property; and Andrew Shedlin, an expert witness.

¶ 16        Wesley testified during deposition that, in October 2018, C.R. Center engaged him and his firm, Edgemark Commercial Real Estate Services (Edgemark), to lease the Property, which was vacant at that time. GMAC and its special servicer, LNR Partners, Inc. (LNR), later engaged him and Edgemark for the same purpose after GMAC assumed ownership of the Property in 2019.

¶ 17        Related to the efforts that Wesley and Edgemark made to lease the Property, Wesley further testified that only Spirit Halloween showed interest in renting the Property, that this interest lasted only a few months, and that GMAC ultimately rejected the proposal because the costs of operating the store were either close to or more than the amount that Spirit Halloween was willing to pay in rent.

¶ 18        Wesley also testified that, after it became apparent that it would have been difficult to lease the Property, GMAC and LNR expressed their desire to sell the Property instead. In August 2020, GMAC and Storebuild, a developer, executed a letter of intent for Storebuild to purchase the

5

Property, and in February 2021, the parties executed a purchase agreement. Wesley testified that, a few months later, Storebuild terminated the purchase agreement because it was unable to obtain the funding that it needed from the Village of Lombard. Wesley also testified that, in October 2021, GMAC sent letters of intent to Pacific and GW Properties, two other developers, to gauge whether they were interested in purchasing the Property for $7.20 million and $7.85 million, respectively, and that, although GW Properties had previously offered to purchase the Property for $4 million, neither Pacific nor GW Properties ultimately expressed an interest in the offers by GMAC.

¶ 19      Wesley further testified that, in January 2022, GMAC conducted an online sale auction of the Property with an opening bid of $4 million, but that no one made a bid. Shortly after the auction, Wesley contracted with Synergy for the sale of the Property, which closed in September 2022 for a sale price of around $4.35 million. Wesley testified that the store on the Property was valueless to Synergy in the context of the sale and that the sale was "for the land, basically, not the building," which "just came along with [the land]."

¶ 20      Shedlin, a professional with 50 years of experience in the area of shopping center leasing, testified to his expert opinions that C.R. Center and GMAC expended commercially reasonable efforts to market the Property for lease, and that there was no lease to occupy the building on the Property and no rental value in that same building. Shedlin testified that, since around the 1980s, the shopping center industry had steadily declined, and that the store on the Property was further difficult to lease because of the market competition; the size, location, and configuration of the store; and the relationship of the store to the shopping center itself. Shedlin explained that the fact that there were no tenants throughout the course of four years who had agreed to rent the store on the Property showed that there was zero value in leasing the store. Shedlin opined that, thus,

6

Synergy had paid nothing for a leasehold interest in the store through the sale, and that, rather, Synergy "would have paid more had the building not existed."

¶ 21 Olson, who was responsible for overseeing the Property and paying its operating expenses, testified that he was familiar with Edgemark's asset management business records and practices; that Edgemark kept general ledgers for the Property; that Edgemark created, stored, and maintained those general ledgers in the ordinary course of business; and that the entries in the general ledgers were made at or near the time that the ledgers were created. Olson further testified that the general ledgers accurately reflected the operating expenses for the Property from January 2019 through October 10, 2022.

¶ 22 During its case-in-chief, Saks called Norris Eber, a professional who worked in real estate for over 50 years, to testify to his expert opinion that C.R. Center and GMAC expended commercially unreasonable efforts to lease the Property. Eber explained that a prudent property owner would have begun planning to lease the Property as early as 2017, which was around the time when Bon-Ton first began experiencing financial troubles, and that a prudent property owner would have also included other professionals on the planning team aside from a broker, such as an architect space planner. Eber also testified that Wood River had no right to lease or sell the Property after receiving the Guaranty via the assignment because Wood River did not own the Property.

¶ 23 At the close of trial, Saks brought a motion for a directed verdict, which the circuit court denied. On September 29, 2023, the court issued a written order awarding judgment in favor of Wood River. As damages, the court awarded Wood River $16,958.97 in unpaid basic rent for February 2018; $158,238.75 per month in unpaid basic rent for the period of September 2018 through September 20, 2022; $1,444,173.11 in operating expenses; and a reasonable attorney fee. The circuit court also applied a 9% per annum pre-judgment interest rate.

¶ 24    On October 26, 2023, Saks filed a motion to reconsider the judgment order, which the circuit court denied. Saks now appeals.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, Saks argues that the circuit court erred by finding that Wood River could enforce the Guaranty, failing to offset the proceeds of the sale of the Property to Synergy from the damages awarded to Wood River, permitting Wood River to recover for GMAC's operating expenses, and applying a 9% per annum pre-judgment interest rate. We will address each of these claims of error in turn.

¶ 27                         A. Enforcement of the Guaranty

¶ 28    As an initial matter, Wood River categorizes Saks's challenge to the enforceability of the Guaranty as an "affirmative defense of lack of standing" and argues that Saks has forfeited the defense by failing to raise it below. The doctrine of standing permits consideration only of disputes that are truly adversarial in nature and capable of resolution by judicial decision. *Benton v. Little League Baseball, Inc.*, 2020 IL App (1st) 190549, ¶ 33. Under Illinois law, standing to sue requires an injury-in-fact to a legally recognized interest. *Martini v. Netsch*, 272 Ill. App. 3d 693, 695 (1995). Additionally, the claimed injury, whether actual or threatened, must be distinct and palpable, fairly traceable to the defendant's actions, and substantially likely to be redressed by the grant of the requested relief. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492-93 (1988). The decision regarding standing can depend on the issue involved, the nature of the relief sought, and whether the party asserting standing would benefit from that relief. *Martini*, 272 Ill. App. 3d at 695; *Amtech Systems Corp. v. Illinois State Toll Highway Authority*, 264 Ill. App. 3d 1095, 1103 (1994).

8

¶ 29        In Illinois, a plaintiff need not allege facts to establish standing. *In re Estate of Schlenker*, 209 Ill. 2d 456, 461 (2004). Rather, lack of standing is an affirmative defense that the defendant must plead and prove. *Amos Financial, LLC v. Szydlowski*, 2022 IL App (1st) 210046, ¶ 44.

¶ 30        Wood River asserts that Saks never properly challenged the enforceability of the Guaranty before the circuit court, in that Saks never objected to Wood River's substitution as plaintiff, filed a motion to reconsider the substitution, or pleaded an affirmative defense of standing. Wood River also points out that, although Saks argued in its motion for summary judgment that Wood River could not recover under the Guaranty, this argument was based on grounds other than any alleged lack of standing, such as, for example, that the assignment of the Guaranty increased Saks's risk.

¶ 31        It is axiomatic that a party that does not raise an issue in the circuit court forfeits that issue and may not raise it for the first time on appeal. *Wells Fargo Bank, N.A. v. Maka*, 2017 IL App (1st) 153010, ¶ 24. However, although parties are required to preserve issues and claims for appeal, they are not required to limit their arguments on appeal to the same ones made in the circuit court. *1010 Lakeshore Association v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 18.

¶ 32        Based on a review of the record, Wood River is correct that Saks never raised an affirmative defense of lack of standing or otherwise expressly asserted Wood River's "lack of standing" below. However, as earlier noted, that which Wood River characterizes as an "affirmative defense of lack of standing" is Saks's argument that Wood River could not enforce the Guaranty, which is an issue that Saks did, in fact, raise numerous times below. For example, in both its motion for summary judgment and motion for a directed verdict, Saks argued that Wood River could not enforce the Guaranty for various reasons, including that the Property was not conveyed to Wood River. Because Saks raised the issue of the enforceability of the Guaranty below, we do not find that Saks forfeited the issue in this appeal, regardless of whether the issue also happens to sound in standing

9

as Wood River suggests. See *Amos Financial*, 2022 IL App (1st) 210046, ¶ 44 (finding that the defendant's argument, that the plaintiff could not enforce the guaranty at issue because the guaranty was not properly assigned, was "essentially one of standing").

¶ 33    Relevant to the merits, Saks argues that Wood River could not enforce the Guaranty because, even though GMAC assigned the Guaranty to Wood River, GMAC sold the Property to a separate party, Synergy. According to Saks, the plain language of the Guaranty itself provided that the rights of GMAC under the Guaranty were not assignable to a party that was not also the "Landlord" under the Lease.

¶ 34    A guarantor's liability depends upon the guaranty contract, to which the general principles of contract construction apply. *Du Quoin State Bank v. Daulby*, 115 Ill. App. 3d 183, 185 (1983). The scope of a guarantor's liability is limited to that which the guarantor has agreed to accept. *Southern Wine & Spirits of Illinois, Inc. v. Steiner*, 2014 IL App (1st) 123435, ¶ 16. When a guaranty agreement is unequivocal in its terms, it must be interpreted according to the language used, and it is presumed that the parties meant what the language clearly imports. *National Acceptance Company of America v. Exchange National Bank of Chicago*, 101 Ill. App. 2d 396, 402 (1968). Courts strictly construe guaranty agreements in favor of the guarantor and accord the guarantor the benefit of any doubts that might arise regarding the language of the contract. *Southern Wine*, 2014 IL App (1st) 123435, ¶ 16. The construction of a contract presents a question of law that we review *de novo*. *Munoz v. Bully & Andrews, LLC*, 2022 IL 127067, ¶ 20.

¶ 35    The Guaranty stated, in pertinent part, that it "shall be legally binding upon Guarantor and its successors and assigns and shall inure to the benefit of Landlord and its successors and assigns." The Guaranty defined the term "Landlord" as referring to WEC.

10

¶ 36    Insofar as it stated that it was to inure to the benefit of the Landlord and its "assigns," the Guaranty contemplated the possibility of it being assigned, and, as it follows, authorized its future assignment. To interpret the Guaranty otherwise would, in effect, render meaningless the language in the Guaranty that provided that it was to also inure to the benefit of the assigns of the Landlord. See *State Farm Mutual Automobile Insurance Co. v. Schmitt*, 94 Ill. App. 3d 1062, 1065 (1981) ("Meaning and effect are to be given to all terms and provisions of a contract where possible. It is presumed that the provisions are purposefully inserted and that the language was not employed idly."). This is because the Guaranty would have no logical reason to refer to the assigns of the Landlord, if the Landlord were not permitted to assign the Guaranty and, thereby, have assigns.

¶ 37    Saks acknowledges that the inurement clause in the Guaranty referenced the assigns of the Landlord, but argues that the Guaranty did not authorize its assignment to just anyone, but rather, only to a party that was also to become the "Landlord" under the Lease. To support this construction of the Guaranty, Saks points to certain provisions of the Guaranty, such as those that stated that "Landlord and Tenant have agreed to amend certain terms and provisions of the Lease ***"; that "the liability and obligation of Guarantor hereunder *** shall remain in full force and effect without regard to *** any of the covenants, terms, conditions or agreements contained in the Lease or this Guaranty ***"; and that "[a]ll of Landlord's rights and remedies under the Lease and under this Guaranty are intended to be distinct, separate and cumulative ***." Saks argues that these provisions show that the Guaranty contemplated that the Landlord thereunder was to always be a party that had rights under both the Lease and the Guaranty, and that Wood River was impermissibly assigned the Guaranty because GMAC deprived Wood River of any rights under the Lease by selling the Property to Synergy.

11

¶ 38        When construing a contract, we are required to consider the contract as a whole and to give effect to all the provisions of the contract, whenever possible. *Wood v. Evergreen Condominium Association*, 2021 IL App (1st) 200687, ¶ 51; *Illinois Tool Works, Inc. v. Commerce and Industry Insurance Co.*, 2011 IL App (1st) 093084, ¶ 27. Here, the provisions that Saks relies upon can be interpreted in a way that renders them consistent with our earlier interpretation that the Guaranty authorized its assignment.

¶ 39        The Guaranty expressly defined the term "Landlord" to refer only to WEC and did not define the term to also refer to any of WEC's future assigns. Furthermore, when Chicago Title, Six Anchors, and WEC first executed the Guaranty, WEC actually owned the Property. Consequently, where the Guaranty referenced the Landlord taking certain actions or having particular rights with respect to the Lease, the term "Landlord" could be reasonably understood to refer exclusively to WEC, who, again, owned the Property at that time and, by virtue of its ownership interest, indeed could take actions and had certain rights with respect to the Lease. Moreover, the Guaranty used terms separate from that of "Landlord" to refer to any future assigns of WEC. For example, the Guaranty provided that it was to inure to the benefit of "Landlord and its *** assigns." If the term "Landlord" were already intended to refer to any future assigns of WEC, then the reference in the Guaranty to "assigns" would have been redundant. Therefore, contrary to Saks's arguments otherwise, the use of the term "Landlord" in the Guaranty does not preclude a finding that the plain language of the Guaranty authorized its assignment.

¶ 40        Next, Saks argues that the circuit court erred by failing to find that it was released from its obligations under the Guaranty because the assignment of the Guaranty to Wood River substantially increased Saks's risk thereunder. In turn, Wood River argues that Saks has waived

12

this defense according to the plain language of the Guaranty. We find that we need not address the issue of waiver because Saks's argument fails on the merits.

¶ 41    The general rule in Illinois is that guaranties are not assignable. *Southern Wine*, 2014 IL App (1st) 123435, ¶ 18. However, this rule is not applied mechanically, but rather, the facts of each case determine whether the policy underlying the rule applies. *Roels v. Drew Industries, Inc.*, 240 Ill. App. 3d 578, 581 (1992). Thus, a guarantor is not released from its obligations under the original contract unless the essentials of that contract and the performance required of the guarantor are materially different from that first contemplated. *Harris Trust & Savings Bank v. Stephans*, 97 Ill. App. 3d 683, 687 (1981). We will apply the manifest-weight-of-the-evidence standard to the circuit court's determination that the assignment of the Guaranty to Wood River did not materially increase Saks's risk, or, in turn, relieve Saks of its obligations under the Guaranty. See *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 27 ("In a bench trial, *** the trial judge[***] is the trier of fact."); *Roels*, 240 Ill. App. 3d at 581 (explaining that whether the general rule of nonassignability of guaranties should be applied is determined by the facts of each case).

¶ 42    In *Southern Wine*, the court considered whether the guarantors there remained liable under a guaranty that had been assigned following its initial execution. *Southern Wine*, 2014 IL App (1st) 123435, ¶¶ 15-22. First finding that the plain language of the guaranty was silent as to whether it was assignable, the court then turned to consider whether, following the assignment, the essentials of the original contract had changed and the performance required of the guarantors was materially different. *Id*. ¶ 17. As part of its analysis, the court noted that there was no evidence that indicated that the guarantors knew that the guaranty was going to be assigned. *Id*. ¶ 21. The court also noted that, following the assignment, the amount that the guarantors might have owed under the guaranty could have varied each month, which indicated a fluctuation in the risk. *Id*. The court concluded,

13

consequently, that the assignment of the guaranty caused a material change to the terms of the original contract and that the assignee could not enforce the guaranty against the guarantors. *Id.* ¶ 22.

¶ 43    Later, in *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 171317, the court similarly considered whether the guarantors there had been relieved of their obligations arising under a guaranty that had also been assigned after it was first executed. *McGinley*, 2018 IL App (1st) 171317, ¶¶ 52-57. Distinguishing the *Southern Wine* decision, the court explained that, unlike in the earlier case, the guaranty in the case before it expressly authorized its assignment and the guarantors had separate reason to know, if not knew, that the guaranty was going to be assigned and expressly reaffirmed their obligations under the guaranty following its first assignment. *Id.* ¶¶ 54-56. The court also noted that the assignment of the guaranty did not change the obligations of the guarantors, insofar as the performance required of the guarantors was still to simply pay the amount due under a note and the assignment did not alter that amount due. *Id.* ¶ 57. Thus, the court concluded that there was no material change to the terms of the original contract and that it could not find that the guarantors were discharged from their obligations under the guaranty. *Id.* ¶ 58.

¶ 44    We find the circumstances in this case to be more similar to those in *McGinley* than to those in *Southern Wine*. To start, as we earlier determined, the plain language of the Guaranty authorized its assignment, like the court in *McGinley* analogously found. Additionally, although there is no evidence of record, other than the terms of the Guaranty itself, that indicated that Saks knew or should have known that the Guaranty was going to be assigned after it was first executed, there is also nothing to suggest that the performance required of Saks changed due to the assignment. Prior to its assignment to Wood River, the Guaranty required Saks to pay all amounts owed by the tenant under the Lease, whenever the tenant failed to pay. After the assignment, the

14

Guaranty continued to require the same of Saks and there is no evidence, unlike in *Southern Wine*, that indicated that the amounts that Saks promised to pay under the Lease would have ever fluctuated or otherwise changed after the assignment. Therefore, the assignment of the Guaranty to Wood River did not cause any material change to the terms therein.

¶ 45    However, to support its argument that the assignment of the Guaranty caused a material change, Saks contends that, when it first entered into the Guaranty, it did so in reliance on the fact that the Landlord under the Guaranty, WEC, actually owned the Property and thereby had "both a contractual and statutory obligation to reasonably mitigate its damages under the Lease and Guaranty," if the tenant under the Lease ever defaulted. Saks explains that, if WEC or any other owner of the Property failed to reasonably mitigate its damages, then that owner would have been precluded from recovering from Saks under the Guaranty. According to Saks, GMAC became less motivated to reasonably mitigate its damages that resulted from Bon-Ton's default under the Lease after it recognized that it could more easily recover its damages by separately selling the Property to Synergy and the Guaranty and associated claims in this action to Wood River. Saks asserts that, after those sales, GMAC was no longer obligated to mitigate its damages because "it did not stand to recover in this action." Saks argues that "[this] is the definition of increased risk."

¶ 46    Significantly, Saks presented no evidence at trial tending to show that GMAC ever actually felt less incentivized to reasonably mitigate its damages after Bon-Ton defaulted under the Lease. Additionally, the circuit court credited Shedlin's expert opinion that C.R. Center and GMAC had expended commercially reasonable efforts to market the Property for lease following the default. Therefore, it was not against the manifest weight of the evidence for the circuit court to find that the assignment of the Guaranty to Wood River did not materially increase Saks's risk under the

15

Guaranty and that Saks was not released from its obligations thereunder. Accordingly, the circuit court also properly determined that Wood River could enforce the Guaranty in this action.

¶ 47    As a final note, Wood River argues that, even if the assignment of the Guaranty did not empower it to maintain this action, then it still could have recovered under the Guaranty because GMAC had assigned Wood River its claims in this action, separate from the Guaranty. Having already determined that Wood River could enforce the Guaranty on the basis of its assignment, we decline to reach the issue of whether Wood River could have also recovered on the basis that GMAC assigned its claims in this action as well.

¶ 48                                    B. Damages Awards

¶ 49    Next, Saks argues that the circuit court erred in assessing the damages ultimately awarded to Wood River, first, by refusing to offset the proceeds of the sale of the Property to Synergy from the award for unpaid basic rent and, second, by permitting Wood River to recover for the operating expenses that GMAC incurred after Bon-Ton defaulted under the Lease. The appropriate standard of review of an award of damages following a bench trial is whether the circuit court's judgment is against the manifest weight of the evidence. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13. A judgment is against the manifest weight of the evidence only when the opposite conclusion is clearly evident or the finding is unreasonable, arbitrary, or not based on the evidence presented. *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 70.

¶ 50                                    1. Offset of Sale Proceeds

¶ 51    The general measure of damages for breach of contract is the amount that will compensate the injured party for the loss that the performance of the contract would have prevented or that the breach of the contract entailed. *Santorini Cab Corp. v. Banco Popular North America*, 2013 IL App (1st) 122070, ¶ 26. The purpose of contract damages is to put the injured party in as good of

16

a position as it would have been in had the contract been fully performed. *Koehler v. Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 126. " 'In determining which measure of damages to use, the trial court must examine the exact interest harmed.' " *Santorini Cab*, 2013 IL App (1st) 122070, ¶ 26. An award in a breach-of-contract action should not place the injured party in a better position, providing for a windfall. *In re Illinois Bell Telephone Link-Up II*, 2013 IL App (1st) 113349, ¶ 19.

¶ 52     In its written judgment order, the circuit court found that GMAC had assigned the Guaranty to Wood River for a price of around $4 million and had sold the Property to Synergy for a separate price of around $4.5 million. The circuit court also found that Wood River had incurred damages in the amount of $7,772,862.72 in basic rent that Bon-Ton had failed to pay under the Lease, prior to the sale of the Property to Synergy. However, further finding that the duty of the owner of the Property to mitigate these damages did not require the owner to sell the Property, the circuit court declined to deduct the $4.5 million in sale proceeds from the damages award of $7,772,862.72.

¶ 53     Saks now argues that the circuit court's decision not to deduct the sale proceeds from the award of damages for unpaid basic rent was erroneous because it permitted GMAC to recover around $8.5 million, the total of the $4.5 million in sale proceeds and the $4 million received for assigning the Guaranty to Wood River, which exceeded the $7,772,862.72 in unpaid basic rent and, thus, constituted a windfall. In response, Wood River argues that Saks has waived the argument that it was entitled to an offset because the Guaranty expressly prohibited Saks's liability from being offset. Wood River also argues that, in the alternative, Saks has forfeited this same argument with respect to the sale proceeds because it did not raise the argument below.

¶ 54     Regardless of whether Saks has waived or forfeited its present argument, the argument fails on its merits. As both parties correctly acknowledge, Illinois law requires "a landlord *** [to] take reasonable measures to mitigate the damages recoverable against a defaulting lessee." 735 ILCS

17

5/9-213.1 (West 2018). Although there is case law in which courts have expressed that this duty to mitigate requires a landlord to make reasonable efforts to *re-lease* the property following a defaulting tenant, we are aware of no binding authority that further requires a landlord to make reasonable efforts to *sell* the property under these same circumstances. See, *e.g.*, *Danada Square, LLC v. KFC National Management Co.*, 392 Ill. App. 3d 598, 609 (2009) ("The purpose of [the statutory duty to mitigate] is to require a landlord to undertake reasonable efforts to relet the premises after a defaulting tenant departs ***.").

¶ 55    Saks cites to multiple cases from foreign jurisdictions to support its argument that the sale proceeds should have been deducted from Wood River's award of damages for unpaid basic rent. Although not binding upon us, we may consider these cases for their persuasive value. See *Wood*, 2021 IL App (1st) 200687, ¶ 54. Nevertheless, we find the cases to be unpersuasive in the context of this appeal because they pertain either to the breach of a lease of personal property or to unpaid rent that became due *only after* the sale of the leased property, neither of which relate to this appeal. See *Krasne v. Tedeschi & Grasso*, 436 Mass. 103, 108 (2002) (finding that the circuit court erred by awarding damages for unpaid rent that accrued after the property was sold, without deducting the sale price from the damages award); *Industrial Leasing Corp. v. Thomason*, 96 Idaho 574, 578 (1974) (holding that the lessor of personal property has a duty to make reasonable efforts to re-lease or sell the property to mitigate its damages in the event of a breach of the lease).

¶ 56    Saks also offers an Illinois case, *Jones v. Hryn Development, Inc.*, 334 Ill. App. 3d 413 (2002), for the proposition that, if a landlord happens to sell its property to mitigate the damages sustained by a defaulting tenant, then the proceeds from the sale of the property must be deducted from the amount that the landlord would have otherwise recovered in damages, independent of whether the landlord actually had a duty to sell the property to mitigate its damages. However, like

18

the cases from foreign jurisdictions to which Saks cites, this case is similarly distinguishable in that it does not involve a breach of a lease of property, but rather of a contract for the sale of property. See *Jones*, 334 Ill. App. 3d at 418 (finding that the circuit court erred by failing to order the seller of real property to return the entire amount in purchase money to the prospective buyers after the prospective buyers breached the sale contract and the seller conveyed the property to a third party).

¶ 57 Finding them to be inapposite, we disregard the decisions relied upon by Saks and find that GMAC was not required to make reasonable efforts to sell the property as a part of its duty to mitigate its damages following Bon-Ton's default under the Lease. Thus, the circuit court properly refused to offset the proceeds from the sale of the Property to Synergy from the amount in damages awarded to Wood River for unpaid basic rent.

¶ 58                                     2. Operating Expenses

¶ 59 Saks further argues that the circuit court erred by awarding Wood River damages for the operating expenses that GMAC incurred following Bon-Ton's default under the Lease because, in calculating the award, the circuit court relied solely on the evidence of four general ledgers that purportedly recorded GMAC's operating expenses from January 2019 through October 10, 2022, which constituted inadmissible hearsay. Additionally, Saks argues that, even if the evidence of the general ledgers were admissible, the evidence was, without more, insufficient to support the award of damages for the operating expenses.

¶ 60 A party seeking damages has the burden of proving those damages to a reasonable degree of certainty. *Nokomis Quarry Co. v. Dietl*, 333 Ill. App. 3d 480, 485 (2002). The evidence presented by the claimant regarding damages must not be remote, speculative, or uncertain. *Id*. If

19

there is an adequate basis in the record to support the circuit court's determination of damages, then the reviewing court must affirm. *Cadle Properties*, 2021 IL App (1st) 200556, ¶ 44.

¶ 61    Separately, hearsay is an out-of-court statement offered for the truth of the matter asserted and is generally inadmissible unless it falls within a recognized exception to the rule. *Pavlik v. Wal-Mart Stores, Inc.*, 323 Ill. App. 3d 1060, 1064 (2001). Illinois Rule of Evidence 803(6) sets forth an exception to hearsay for records of "regularly conducted business activity" (business records exception to hearsay). Ill. R. Evid. 803(6) (eff. Jan. 25, 2023). The foundation requirements for a document to be admitted under the exception are that it is a writing or record made as memorandum of an event, the document was made in the ordinary course of business, and it was the regular course of business to make such a record at the time of the event or within a reasonable time thereafter. *City of Chicago v. Old Colony Partners, L.P.*, 364 Ill. App. 3d 806, 819 (2006). "Anyone familiar with the business and its procedures may testify as to the manner in which records are prepared and the general procedures for maintaining such records in the ordinary course of business," and "[a] lack of personal knowledge of the record does not affect the admissibility of the record, but may affect the weight of the evidence." *Id*. A court's determination of whether to admit evidence must not be disturbed, absent an abuse of discretion. *Id*. at 818.

¶ 62    Insofar as the general ledgers that were introduced at trial contained statements that were made prior to trial and were offered to prove the true amount of operating expenses that GMAC incurred following Bon-Ton's default under the Lease, the ledgers constituted hearsay. It is unclear whether Saks now challenges the admission of the general ledgers into evidence pursuant to the business records exception to hearsay. However, to the extent that it does, at trial, Olson, whom Edgemark employed to oversee the Property and pay the Property's operating expenses, testified that he was familiar with Edgemark's business records, its standard practice of creating and

20

maintaining its ledgers for the properties that it managed, the system used to create these ledgers, and the general ledgers for the Property. Olson further testified that the general ledgers were created, stored, and maintained as part of Edgemark's routine business operations; that the entries in the general ledgers were made contemporaneously by someone with knowledge of the expenses reflected; and that the general ledgers accurately showed the Property's operating expenses for the indicated periods. Thus, the circuit court properly admitted the general ledgers into evidence pursuant to the business records exception to hearsay.

¶ 63        As to Saks's argument that the admitted evidence of the general ledgers was otherwise insufficient to support the damages award for operating expenses, Saks explains that this is because the evidence was entitled to "no weight" by virtue of being hearsay, which is "inherent[ly] weak[***]." Saks also argues that the evidence of the general ledgers was insufficient for the separate reason that Olson's testimony was speculative in that Olson testified that he had no personal knowledge of Edgemark's management of the Property prior to March 2020, the month when he began his employment there; he did not himself create the general ledgers; he did not know when exactly the individual entries on the general ledgers were made; he did not know why certain entries on the general ledgers were made; he did not know the specific manager who generated three out of the four general ledgers introduced at trial; and some of the general ledgers were "run" for this litigation.

¶ 64        To start, we are aware of no binding authority that states that admissible hearsay evidence is entitled to no weight by sole virtue of being hearsay, nor do most of the cases cited by Saks stand for this proposition. See, *e.g.*, *Curt Bullock Builders, Inc. v. H.S.S. Development, Inc.*, 225 Ill. App. 3d 9, 22 (1992) (finding that expert testimony should have been stricken because the support for the testimony was conjectural, inadmissible hearsay, and of a type not reasonably relied

21

upon by experts in the field); *Lynch v. Mid-America Fire and Marine Insurance Company*, 94 Ill. App. 3d 21, 29 (1981) (describing hearsay evidence as having an "inherent weakness," but not stating that it was entitled to no weight); *People v. McCoy*, 44 Ill. 2d 458, 460 (1970) (explaining that an inherent vice of hearsay is that the hearsay statements might be true but the related facts false); *People v. Harrison*, 25 Ill. 2d 407, 414 (1962) (merely stating that the probative value of hearsay evidence is not enhanced by a lack of an objection to it); *First National Bank & Trust Company of Rockford v. Illinois National Bank & Trust Company of Rockford*, 19 Ill. 2d 385, 392-93 (1960) (stating only that the hearsay nature of evidence affects its weight, but not that such evidence is entitled to no weight).

¶ 65    In one of the cases to which Saks cites, *Looby v. Buck*, 20 Ill. App. 2d 156, 161 (1959), although it is true that the court there stated that hearsay evidence has no tendency to prove any fact in question, the court made this statement while considering a witness's non-responsive answer to a question that specifically "call[ed] for an answer based on his personal knowledge." *Looby*, 20 Ill. App. 2d at 161. The court also went on to find that the damages award that this answer was used to support was not based on competent evidence for the additional reasons that the witness completely lacked the relevant personal knowledge and most of the other evidence in the record tended to counter the testimony of the witness. *Looby*, 20 Ill. App. 2d at 161-62. In contrast, and as we noted earlier, Olson testified that he was personally familiar with multiple aspects related to the creation, maintenance, and storage of the general ledgers, and there was little to no evidence that contracted Olson's testimony. Thus, the *Looby* decision did not compel the circuit court to assign absolutely no weight to Olson's testimony.

¶ 66    As to Saks's remaining arguments, it is unclear in what way the information to which Olson was unable to testify, such as the identity of the managers who generated some of the general

22

ledgers introduced at trial and the reason that certain entries were included in the general ledgers, undermined the reliability of the information therein. As to the fact that Olson did not personally create the general ledgers and could not testify as to exactly when individual entries in the general ledgers were made, there is no authority that required such of Olson in order for the circuit court to assign weight to Olson's other testimony that the information was, at the very least, entered at or near the time that the reported expenses were incurred. Additionally, as Wood River points out, although Olson testified that the general ledgers were *run* for purposes of this litigation, this does not directly contradict Olson's separate testimony that the individual information and entries were nevertheless first *created* at or near the time when the expenses were incurred. For these reasons, we find that the circuit court properly awarded Wood River damages for operating expenses based on the evidence of the general ledgers.

¶ 67                         C. Pre-Judgment Interest Rate

¶ 68        Last, Saks argues that the circuit court erred by applying a 9% pre-judgment interest rate to the damages award because the rate exceeded that permitted by the terms of the Lease and by the applicable statute. Resolution of this issue requires us to interpret the provisions of the Lease, making the applicable standard of review *de novo*. See *Gray v. Mundelein College*, 296 Ill. App. 3d 795, 803 (1998) ("The interpretation of a contract is a question of law to be reviewed *de novo* on appeal.").

¶ 69        The parties agree that the Lease permits "the maximum amount of interest permitted under applicable state law." Separately, the Illinois Interest Act (Act) allows parties to a contract to agree to a pre-judgment interest rate of 9% or less per annum, and provides that a minimum pre-judgment interest rate of 5% per annum is to apply when an agreement does not expressly state the applicable rate. 815 ILCS 205/2, 4 (West 2018).

23

¶ 70    Here, because the Lease provided for the maximum amount of interest to be applied and the maximum pre-judgment interest rate allowed under the Act was 9% per annum, we find that the plain language of the Lease permitted this very same pre-judgment interest rate to be applied in this case. Therefore, the circuit court properly awarded Wood River 9% per annum in pre-judgment interest.

¶ 71                              III. CONCLUSION

¶ 72    The judgment of the circuit court of Du Page County is affirmed.

¶ 73    Affirmed.